370 P.2d 279

John D. SPROUL, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona
and Leach's Air Conditioning,

Respondents.

No. 7263.

Supreme Court of Arizona.

En Banc.

April 4, 1962.

Whitehill, Feldman & Scott, Tucson,
and Udall & Udall, and Paul G. Rees, Jr.,
and William D. Browning, Tucson, for
petitioner.

C. E. Singer, Jr., Phoenix, Donald J. Morgan, James D. Lester, Edward E. Davis, Lorin G. Shelley, Phoenix, of counsel, for respondent Industrial Commission.

JENNINGS, Justice.

John D. Sproul, hereinafter called "petitioner", seeks by certiorari to review the findings and award made by the Industrial Commission, hereinafter called "Commission", and to have said findings and award set aside.

On August 5, 1957 petitioner sustained an injury to his back by an accident arising out of and in the course of his employment with Leach's Air Conditioning. He was treated by Dr. Warren D. Eddy, Jr. who performed an operation on petitioner's back, known as a laminectomy, involving the fusion of two of the spinal vertebrae.

Although the operation was considered successful from an orthopedic point of view, there were still some residual findings connoting disability and impairment of petitioner's back. However, it was thought that no further treatment of the physical difficulty was necessary at that time. The doctors[1] therefore recommended that petitioner's case be closed with a finding of 10% general physical functional impairment, predicated on the patient's history, the spinal fusion, and the residual stiffness and limitation of motion of petitioner's back.

Despite the physical findings, petitioner continued to complain of severe pain in his back together with a tenderness in the region where the operation had been performed. The doctors stated that these were symptoms of the petitioner's neurosis,[2] which manifested itself in pain for which there was no organic cause.[3] This neurosis was still present at the time of Dr. Eddy's last examination of the petitioner.

On May 23, 1960 a hearing was held in order to determine the loss of earning capacity, if any, which petitioner had sustained by reason of his injury. Dr. Eddy testified that in his opinion the petitioner was physically limited from engaging in

1. Petitioner was last seen in consultation on October 5, 1959 by Drs. Eddy, Beaton (a neuro-psychiatrist), Schwartzmann, and Tanz.
2. Prior to the operation on petitioner's back, Dr. Eddy referred him to Dr. Charles P. Neumann, a neuro-psychiatrist, who examined petitioner and made a diagnosis of a "hypochondriacal reaction" (a form of neurosis or mental disease).
3. In defining the word "neurosis" as used in connection with the petitioner, Dr. Eddy stated:
   "Well, the word, 'neurosis' * * * means a psychological behavoir change which manifests itself in converse symptoms, that is symptoms which are not related—which either exaggerate present complaints or create in the unconscious feelings of pains or disability in other areas, or perhaps just generally. * * *"

the type of work which he had been doing at the time the accident occurred, and that petitioner should not return to heavy work nor work requiring repeated lifting or bending. It was thought that petitioner should find some work which entailed a sedentary type of activity with little or no bending or lifting. Dr. Eddy stated that petitioner's physical impairment would prevent him from doing any of the types of work with which he had experience, except for possibly light gardening, farming, or cafe work.[4]

A few months prior to the hearing petitioner, with his wife, undertook the management of a small cafe. Petitioner performed the functions of a short order cook and dishwasher, while his wife waited upon tables and handled the other necessary chores. However, petitioner stated he found it impossible to be on his feet more than two or three hours at a time (although he was at work from 12 to 14 hours per day) and it was therefore necessary for him to place a cot in the backroom of the cafe where he lay down when his back began to hurt him or when-

ever it was not necessary for him to be on his feet.

Petitioner testified at the hearing that the neurosis limited his ability to perform work in the sense that it prevented him from doing the light work which otherwise he might have been physically able to do. He stated that any kind of work or activity which required lifting or bending caused pain which was so severe that it prevented him from continuing with such activity; that he is never free from pain in his back; and that the more work he tries to do the worse the pain gets. He testified that the only type of work which he had been able to perform since his injury of August 5, 1957 was the cafe work and that he was unable to work an eight-hour shift, or for any protracted period of time.

On September 22, 1960, a second hearing was held by the Commission. At this hearing Dr. Lindsay E. Beaton, a neuropsychiatrist, testified that in his opinion, as of October 1959, the date of his last examination of petitioner, the petitioner was totally disabled from an emotional standpoint because of his hypochondriacal con-

---

4. Prior to his work with Leach's Air Conditioning, petitioner had done iron work, which involved heavy lifting; outdoor work such as yard maintenance and gardening; and mining.

In answer to the question whether petitioner was physically unable to perform the duties required of his former occupation Dr. Eddy stated:

"There are several of them. The heavy labor work, the air conditioning work, I would say definitely he shouldn't be doing, and farming, of course, and gardening are things which I think could be done with certain reservations. And heavy structural steel, I would think would be out. Of the things he mentioned I think, that of the former occupations, I think that, light farming or gardening would be only in that sphere that I would think he could return."

viction that he was sick.[5] When informed that petitioner was in fact working, Dr. Beaton stated that something had happened in petitioner's psychological setup enabling him to carry on a certain amount of work, but that without further facts (what petitioner is actually doing in his job, what his reaction to it is, etc.) he could not evaluate his working ability at that time.

On January 19, 1961 the Commission made its final award based in part upon the following findings:

"1. That * * * [petitioner] sustained personal injury by accident arising out of and in the course of his employment on August 5, 1957.

\*     \*     \*     \*     \*     \*

"8. That * * * [petitioner] sustained a 10% general physical functional disability as the result of said accident.

"9. That * * * [petitioner] is physically able to perform the duties of a fry or order cook on a five-hour day, six days per week basis; that the reasonable value of such services is the sum of $1.75 per hour and therefore the * * * [petitioner] may reasonably expect to earn the sum of $227.50 per month, or 87.69% of the average monthly wage * * * * [petitioner] earned prior to said accident.

"10. That * * * [petitioner] has sustained a 12.31% loss of earning capacity and therefore is entitled to an award for an unscheduled permanent partial disability in the sum of $17.57 monthly until further order of this Commission.

"11. In finding that * * * [petitioner] has sustained a 12.31% loss of earning capacity, this Commission has taken into consideration, in addition to the above, the following:

"(a) That * * * [petitioner] was 50 years old at the time of said accident.

"(b) That * * * [petitioner] has a seventh grade education.

"(c) That * * * [petitioner's] lifetime occupations consist mainly that of an unskilled laborer."

Petitioner contends the Commission erred in its findings and award for the reasons that the award arbitrarily disregards uncontradicted medical evidence as to mental disease proximately caused to petitioner by the accident and is contrary to and unsupported by the evidence as to petitioner's disability and loss of earning capacity.

---

5. With reference to defining a "hypochondriacal reaction" Dr. Beaton was asked:
   "Q. * * * When you speak of a hypochondriacal reaction in this gentleman, [petitioner] you are not indicating anything in the nature of malingering or anything that he consciously can control, are you, Doctor?
   "A. No, I am not."

This court has held on previous occasions that neurosis, causally connected with a physical injury received by a workman arising out of and in the course of his employment, is compensable under the Arizona Workmen's Compensation Act. Murray v. Industrial Commission, 87 Ariz. 190, 349 P.2d 627 (1960) ; Harmon v. Industrial Commission, 76 Ariz. 40, 258 P.2d 427 (1953) ; Safeway Stores v. Gilbert, 68 Ariz. 202, 203 P.2d 870 (1949) ; American Smelting & Refining Co. v. Industrial Commission, 59 Ariz. 87, 123 P.2d 163 (1942). However, only those injuries which produce financial loss to the injured party entitle him to compensation. Wood v. Industrial Commission, 91 Ariz. 14, 368 P.2d 758 (1962) ; Engle v. Industrial Commission, 77 Ariz. 202, 269 P.2d 604 (1954).

In the instant case respondent Commission does not deny petitioner is suffering from neurosis nor does the Commission question the causal relation between the physical injury sustained by petitioner and the neurosis, for the Commission stated:

"There is *no question* as to the causal relation between the injury sustained and the neurosis which manifested itself thereafter. The relation of said neurosis to the injury is well established by the medical evidence and Respondent does not deny nor controvert this fact." (Emphasis original.)

It is the Commission's position that the finding "that he [petitioner] sustained *injury*" and that "he has general functional disability" includes by implication *all* the elements of the injury as disclosed by the evidence. The Commission contends it was not required to make a specific finding that the petitioner was suffering from a neurosis nor to set forth in detail every fact of the petitioner's injuries and the mere failure to so set forth by specific findings the injury or injuries does not exclude such disability. Therefore, the award of 12.31% loss of earning capacity necessarily included the neurosis causally connected to petitioner's physical injury.

The petitioner contends, however, that the Commission failed to take into consideration the neurosis in the award since the findings made no mention whatever of the diagnosed neurosis or mental disease. He maintains the award is contrary to law since it arbitrarily disregards uncontradicted medical evidence as to mental disease proximately caused to petitioner by the industrial accident.

This court stated in Foster v. Industrial Commission, 46 Ariz. 90, 92, 47 P.2d 428, 429 (1935):

" * * * We are of the opinion that it is not essential under our statute that specific findings of fact be made on every issue which might be involved in a hearing, *provided that the*

*findings as made are of such a nature that they necessarily dispose of all the material issues involved. * * * "* (Emphasis supplied.)

The findings made by the Commission in the instant case did not "dispose of all the material issues involved". There is no dispute of the fact that the petitioner was suffering from a neurosis causally connected to his physical injury and yet the evidence discloses that such disease was not taken into consideration by the doctors when they made their recommendation that petitioner's case be closed with a finding of 10% general physical functional impairment. Dr. Eddy testified that the rating of 10% functional disability was based only upon the physical injury.[6] According to the testimony of Dr. Eddy, had the neurosis been taken into consideration petitioner would be disabled beyond the finding of a 10% general physical functional disability. For, Dr. Eddy testified to wit:

"Q. And does that neurosis in any way limit his ability to perform work? By the word 'limit' I don't mean physically limit, but limit his ability in the sense that it prevents him from doing the work which he might physically be able to do otherwise?

"A. Oh, I don't think there is any question that that's so. I think that's the usual—that's what we mean by a functional overlay, it's that unconscious inhibition which doesn't allow a body to behave as it physically should by its examination.

"Q. So in other words, if we were— if you had considered and if we were to give weight to the question of Mr. Sproul's functional overlay or neurosis, he is suffering from a greater functional or greater disability than the ten per cent functional disability about which you spoke earlier, is that correct?

"A. I think so * * * I'm not able to just state how much that he can do. *Our ten per cent disability estimation I think is, and as far as the Industrial Commission is concerned, completely neglects the psychological problem.* This is based entirely on physical findings * * *. At least that's been my understanding and my instructions as far as the handling of Industrial Commission compensation cases. * * *" (Emphasis supplied.)

"Q. In other words, the finding of a ten per cent functional disability excludes any disability that he might suffer by reason of that neurosis?

"A. I think we'd say that, yes, because the—yes, I think we do exclude that functional problem, yes."

6. The testimony on this point was:
"Q. Now when you state that Mr. Sproul [petitioner] was suffering from a ten percent functional disability, was the neurosis about which we just spoke, a part of that finding?
"A. No.

Dr. Beaton's testimony also supports petitioner's proposition that the Commission failed to consider the neurosis in the award. He testified as follows:

"Q. Would you agree that at this time with this emotional or mental disability that he [petitioner] has that he is for practical purposes totally disabled as of right now?

"A. I believe that I would agree that he is *totally disabled from an emotional standpoint right now.*" (Emphasis supplied.) [7]

Although it is not essential that specific findings of fact be made on every issue involved in a hearing the findings as made should be of such a nature that they necessarily dispose of all the material issues involved. Foster v. Industrial Commission, supra. The findings as made by the Commission in the instant case did not dispose of all the material issues since they failed to take·into account petitioner's neurosis. The Commission's findings and award should have taken into consideration not only the physical disability of petitioner but his mental disability as well. The evidence fails to support the Commission's contention that they did.

Nor is the award of 12.31% loss of earning capacity reasonably supported by the evidence. The Commission based the award upon its findings that petitioner is physically able to perform the duties of a fry or order cook on a five-hour day, six days per week basis, the reasonable value of such services being $1.75 per hour, and therefore petitioner could reasonably expect to earn $227.50 per month or 87.69% of the average monthly wage petitioner earned prior to said accident.[8] In addition the Commission took into consideration petitioner was 50 years old at the time of the accident, has a seventh grade education and that his lifetime occupation consisted mainly of an unskilled laborer.

The evidence in the record does not sustain the Commission's finding that petitioner was able to earn $227.50 per month as a fry or order cook. In arriving at this figure the Commission set $1.75 per hour as the reasonable value of petitioner's services. This was based on the earnings paid an employee in a similar occupation [9]

---

7. Dr. Beaton later qualified this statement when informed petitioner was presently working stating that his diagnosis was of the petitioner's condition at the time of the doctor's last examination of him in October of 1959, and that something must have happened in petitioner's psychological setup to enable him to now carry on a certain amount of work but that without further facts the doctor could not evaluate his working ability at this time.

8. Petitioner's average monthly wage at the time of injury was $259.45.

9. An affidavit submitted to the Commission by Esther Henderson who operated the Villa Cafe in Tucson stated she paid two fry cooks who do the short order cooking $11.00 each per day and that they worked eight hours a day.

and upon the "working agreement" used by the Culinary Workers Union. However, a review of the evidence does not support such contention. The Culinary Workers Union's minimum wage for a fry or order cook is $11 per day for an eight-hour day which figures out $1.375 per hour, not $1.75 per hour. This is the same wage paid the employees by the operator of the Villa Cafe. In addition, petitioner had no training as a fry cook prior to the undertaking of the management of the Big Bun Cafe.[10] Such fact would tend to negative any inference that the reasonable value of petitioner's services would be greater than the minimum wage required by the Union or paid by others.

Petitioner also testified it was impossible for him to work more than two or three hours at a time without lying down and that he usually opened up the cafe in the morning, worked for about two hours during the noon rush, worked for two or three hours during the evening rush and then closed up the cafe. Thus, the Commission arrived at the conclusion petitioner was capable of working five hours per day six days per week. This, the Commission contends, sustains their position that they did in fact take into consideration the neurosis and the resulting limitation on petitioner's ability to work.

This court stated in Ossic v. Verde Central Mines, 46 Ariz. 176, 191, 49 P.2d 396, 402 (1935):

"* * * in determining the percentage of disability the commission should consider not only the actual impairment of the physical and mental capacity of the injured person to do work, but whether and to what extent his injury is likely to deprive him of the ability to secure the work which he might do if he were permitted to attempt it."

Petitioner testified he was unable to work an eight-hour shift or to be on his feet for any protracted period of time. He states he is unable to work for more than two or three hours at a time without lying down. There is no evidence petitioner could even secure work from others under such conditions either as a fry cook or doing other prescribed work.[11] It is possible that under such circumstances petitioner would be precluded from working at all had it not been that he was self-employed.

In determining the future earning capacity of a disabled man the object is to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell

10. That is the name of the cafe operated by petitioner and his wife.

11. Light gardening or farming.

his services and for how much. Davis v. Industrial Commission, 82 Ariz. 173, 309 P.2d 793 (1957). To support a finding in this respect the Commission must have evidence that will at least demonstrate the reasonableness of the determination made. Davis v. Industrial Commission, supra. In the instant case there was no such evidence. In addition to the fact petitioner may not have been able to secure employment in a competitive labor market the evidence shows that petitioner's operation of the Big Bun Cafe returned a total net profit of only $489.45 during a three-month period. This figure represented the earnings of both petitioner and his wife in operating the cafe. The Commission's award of 12.31% loss of earning capacity is not reasonably supported by the evidence.

Petitioner discussed one other point with reference to the determination by the Commission that petitioner's condition was "stationary" without assigning error. Claimed errors not assigned will not be reviewed. Minton v. Industrial Commission, 90 Ariz. 254, 367 P.2d 274 (1961).

The award is set aside.

BERNSTEIN, C. J., and STRUCKMEYER and LOCKWOOD, JJ., concur.

Note: UDALL, V. C. J., being disqualified, did not participate in the determination of this appeal.