411 P.2d 474

Marvin M. HUGHES, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona and San Xavier Rock & Sand Company, Respondents.

1 CA–IC 48.

Court of Appeals of Arizona.

March 1, 1966.

Ira Schneier, Tucson, for petitioner.

Robert K. Park, and Joyce Volts, Phoenix, for respondents.

CAMERON, Judge.

This is a writ of certiorari to review an award of the Industrial Commission made pursuant to § 23–1044, subsecs. C, D, A.R. S., finding that the petitioner's earning capacity is the amount of $393.00 per month.

We are called upon to determine whether this finding is supported by the evidence.

Petitioner sustained an industrial injury to his back on 22 January, 1962. At the time of the injury he was 42 years of age, with an eighth grade education. During most of his adult life he had been doing heavy duty mechanical work particularly on heavy duty trucks used in the construction industry. As a result of the injury, a laminectomy was performed on 28 February, 1963, and after his condition became stationary, the Commission found that petitioner had sustained a 15% general functional physical disability. This finding is not contested. After considerable activity by the Commission including a hearing conducted on 1 October, 1964, the Commission, on 7 December, 1964, issued its findings and award. The Commission found that the petitioner's average monthly wage prior to the injury was the sum of $695.21, and the:

"Commission finds said applicant has the ability to perform the duties of a night watchman to the extent he may reasonably expect to earn the sum of $422.00 per month; so he has therefore suffered a 39.30% loss of earning capacity and is entitled to the sum of $150.27 monthly until further order of the Commission."

Petition and Application for rehearing was filed 10 December, 1964, based upon the question of petitioner's ability to perform the duties of a night watchman at the salary indicated. Hearing on this issue was held 9 February, 1965. After the 9 February hearing, the amount of $422.00 was reduced to $393.00 per month.

The record shows that petitioner, after his injury and surgery, attempted not only to return to his regular job, but made numerous applications for employment involving light maintenance work, repair of small motors and bicycles, and that he was registered with the Arizona State Employment Office in Tucson for light maintenance work and with his union, and that he put in applications at the University of Arizona and Davis-Monthan Air Force Base in Tucson. At the time of the hearing of 9 February, 1965, petitioner was employed in Tucson assembling and disassembling starters and generators. It was described as bench work and he stated as follows:

"Question: Are you sitting at the bench doing this?

"Answer: Part of the time sitting, part of the time standing. Most of the time you are supposed to be standing. They told me I can stand part of the time and sit part of the time."

Dr. Elkins in his testimony at the hearing 1 October, 1964, had stated that while petitioner would be limited in any strenuous activity, lifting, prolonged driving and sitting, that he could do a certain amount of bench work:

"Answer: I think if you were given an opportunity to get up and move around periodically that this would be perfectly possible."

Petitioner was earning at that time approximately $250.00 per month. It is the contention of the Industrial Commission that he could earn $393.00 per month as a night watchman, and that the difference between that amount ($393.00) and his previous average monthly wage ($695.21) represents his loss of earning capacity. The Commission admittedly obtained its evidence concerning the salary and availability of a night watchman's job from the Tucson High

School District Number 1. Mr. John Evans Timbers, the person in charge of hiring night watchmen at Tucson High School, testified as follows:

"Question: In these individuals do you look to see if they are physically handicapped in this regard?

"Answer: Certainly. We would want a person who would be able, although primarily it is walking, in an emergency like that we would want them to move rapidly or even run if the case required it.

"Question: How many of these night watchmen do you have?

"Answer: Seven.

"Question: How many job applicants do you have for this position, would you say? · · · ·

"Answer: This would be just a guess, I would say anywhere at the moment from maybe 15 or 20 on file.

"Question: How many openings have you had for this particular job within the past year?

"Answer: We have had no openings within the last year.

"Question: When was the last time, to the best of your recollection, you had an opening?

"Answer: I would say back at least two years, perhaps to three years.

"Question: So you would say as far as you are concerned, this job is not readily available for anybody at this time?

"Answer: I would say openings are very definitely limited. There are only seven in the whole system and the turnover is practically nil."

John P. Butler, the Area Labor Market Analyst for the Arizona State Employment Service testified as follows:

"Question: What has been the average during the past year, Mr. Butler, with respect to the number of jobs, job applicants being on the list for these jobs in this area?

"Answer: For watchmen, there would be an average of about 40—there were 39 at the close of January.

"Question: And how many positions on the average per month do you fill?

"Answer: One, perhaps two, on the average."

And:

"Question: Let's read up to—let me rephrase that. Assuming Mr. Hughes, in the light of his experience, has been able to get a bench job earning $1.50 per hour, sitting at a bench assembling starter motors, would you say in view of his education, his training, experience· and physical limitations as I have previously outlined to you, would you say this is a job he can compete for and keep in this particular locality?

"Answer: One of the things we are trying to do here is to make placements with assumptions, and this depends upon the qualifications of the job and the desire of the employer and how well the abilities of the individual meet these. If the gentleman involved has a job of this nature and is holding it, with the labor market as it is today, I would assume that he is satisfactorily meeting the competition as it is coming along, because there are many unemployed people in Tucson competing for jobs right now."

Section 23–1044 A.R.S., subsection C, states in part, as follows:

"* * * Where the injury causes permanent partial disability for work, the employee shall receive during such disability compensation equal to fifty-five per cent of the difference between his average monthly wages before the accident and the amount which represents his reduced monthly earning capacity resulting from the disability."

Subsection D states that in determining the amount which represents the reduced

monthly earning capacity, consideration shall be given, among other things, to:

"* * * [T]he nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to injury * * *."

Our Supreme Court has stated:

"The problem of determining the future earning capacity of a disabled man involves a certain amount of indefiniteness. The object is to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much. To support a finding in this respect the commission must have evidence that will at least demonstrate the reasonableness of the determination made. There must be something that will justify the conclusion that he is able to perform the services which are used as a basis for measuring earning capacity." Davis v. Industrial Commission, 82 Ariz. 173, 175, 309 P.2d 793, 795 (1957).

And:

"In determining the future earning capacity of a disabled man the object is to determine as near as possible whether in a competitive labor market the subject in his injured condition can probably sell his services and for how much. Davis v. Industrial Commission, 82 Ariz. 173, 309 P.2d 793 (1957). To support a finding in this respect the Commission must have evidence that will at least demonstrate the reasonableness of the determination made. Davis v. Industrial Commission, supra. In the instant case there was no such evidence. In addition to the fact petitioner may not have been able to secure employment in a competitive labor market the evidence shows * * [t]he Commission's award of 12.31% loss of earning capacity is not reasonably supported by the evidence." Sproul v. Industrial Commission, 91 Ariz. 128, 135, 136, 370 P.2d 279, 284 (1962).

We do not feel that the evidence reasonably supports the Commission's position that petitioner in his present physical condition is able to obtain a job of night watchman for the amount of $393.00 per month.

The award is set aside.

STEVENS, C. J., and DONOFRIO, J., concur.