411 P.2d 36

**Charles W. DABBS, Petitioner,**

**v.**

**The INDUSTRIAL COMMISSION of Arizona and Magma Copper Company, Respondents.**

**No. 1 CA–IC 79.**

Court of Appeals of Arizona.

Feb. 18, 1966.

Donald D. Holroyd, Phoenix, for petitioner.

Richard J. Daniels, Phoenix, former attorney for respondent The Industrial Commission of Arizona.

Robert K. Park, Chief Counsel, Phoenix, for respondent The Industrial Commission of Arizona.

Twitty, Sievwright & Mills, by John F. Mills, Phoenix, for respondent Magma Copper Co.

DONOFRIO, Judge.

This is a writ of certiorari to review an award of the Commission denying petitioner Charles W. Dabbs' motion to reopen his claim.

On March 3, 1961 the Commission entered its award to petitioner for temporary total disability from October 22 through December 12, 1960 and made a finding that petitioner suffered no resulting physical disability. There was no protest or petition for rehearing but on July 21, 1961 petitioner filed this application for readjustment or reopening. It was denied on August 14, 1961, the Commission finding that the medical evidence failed to substantiate the application. Upon rehearing the Commission affirmed its award. Petitioner sought this writ of certiorari.

The following facts were before the Commission: Petitioner who had worked for the Magma Copper Company since 1956 was injured on October 21, 1960, while working as a chute blaster. An air hose attached to a jackhammer was being dragged along by a muck train when he was caught by the hose and knocked off his feet, dragged around the drift and "banged up quite a bit". In the accident petitioner lost consciousness and was bruised across the back. A skull guard he was wearing was "busted" in the accident. He was taken to the company hospital, examined by Dr. J. B. Adams, given emergency treatment, released and taken home.

That night he was "hurting and aching all over" and his wife took care of him by rubbing him with alcohol, applying heat pads and giving him pills which were handed him at the hospital. She testified he suffered severe headaches and soreness all night. Three days later he returned to the hospital and was hospitalized and his neck and leg were placed in traction. They treated him with infra red bake to his back and neck and constant medication for his headaches. He remained in the hospital over three weeks and was released to return thereafter on an out-patient basis. Evidence showed he complained of the headaches and was told by Dr. Finke, company doctor, that they were chronic and would wear off. He was also referred to Dr. Stovall in Phoenix for orthopedic consultation and the doctor's report revealed no history of head injury.

He returned to light work in December 1960 and on February 22, 1961, he was dropped from the payroll, reason "a felony and is in the county jail at Florence." Dr. Finke discharged him from treatment on February 23, 1961 as ready for regular duty.

On March 13, 1961 petitioner entered the Veterans' Administration Hospital in Phoenix staying until September 26, 1961. He gave a history of having sustained a head injury five months before and symptoms of headaches, inability to sleep and tension. Various tests and examinations were conducted by V. A. Dr. Frazin, who specialized in psychiatry and neurology. This consisted of physical examinations, laboratory tests, skull x-ray, electroencephalogram, spinal fluid, urinary analysis, blood serology, chest x-ray, and a neurological and psychiatric examination. The objective findings consisted of a scar in left temporoparietal region, translucency in left side of skull with irregularity of blood vessels, abnormal EEG with a focal area of abnormality in the left side of head, and the spinal fluid examination showed an elevated total protein of 40 milligrams and an elevated globulin test. During his stay in the hospital he was treated for severe headaches which was continued when he was placed on out-patient treatment. Dr. Frazin expressed his opinion that petitioner suffered from a "chronic brain syndrome that was associated with trauma" which leads to personality changes and chronic severe headaches. He noted that there was a changed personality from the petitioner's previous history as gathered from previous records from the service. He stated that abnormal EEG and the elevated protein globulin were factors in aggravating his anxiety and emotional instability. Dr. Frazin testified as to what he meant by chronic brain syndrome and its effect on petitioner's ability to perform gainful occupation:

"A. In plain language, although it is a medically used term, "wastebasket diagnosis" because all we can put in that diagnosis are the

positive physical findings based on objective laboratory and x-ray tests. It really means that although we cannot open the brain and take the brain out to show an area of scar tissue, in all probability from our past experience it indicates a localized area of brain damage that shows itself in the x-ray, the spinal fluid test, etc. The elevated globulin and protein indicates that there are signs of some old blood that was in the spinal fluid. It means that although the blood is out of the spinal fluid the part of the blood that cannot be removed from the spinal fluid naturally is left in the form of parts of the blood cells that can be tested. That is called protein and globulin, the different elements of the blood itself.

Q. Relating this condition to Mr. Dabbs, are you able to form an opinion based upon examination as to how this chronic brain syndrome affected Mr. Dabbs' condition, if it did, or his general physical ability?

A. Physically, it probably could not be seen by an average lay person as having to cause anything other than his—at the time he was under observation he did not have a blackout spell when he complained of headache, I could not feel it but he showed the appearance of a person who was suffering some symptoms. As I pointed out, we saw the scar, the x-ray showed a slight discrepancy. Physically there was a laboratory finding in keeping with our experience of old blood having been in the spinal fluid. It affects him more or less emotionally, if he cannot have complete control of all of his functions in that if it interferes with his brain wave in his attempt to overcome it, he would become increasingly disturbed and not be able to function as efficiently as he had before. He would manifest it physically by not being able to do the work he had done before in a smooth, efficient manner that he is accustomed to doing it. This cannot be seen except by observing the man over a period of time.

Q. Then it did in your opinion affect Mr. Dabbs' ability to perform gainful occupation, is that correct?

A. That is true but to what degree I cannot guage."

He further testified that the chronic brain syndrome was connected with and related to trauma which he classified from his experience of seeing 35,000 service men, as "moderately severe trauma", and that it was related to "fairly recent trauma."

Because petitioner's difficulties with the law have been considered on the question of his changed personality and credibility it becomes necessary to briefly relate the circumstances thereof as revealed by the record. Petitioner has a history of drinking and fighting with his wife. In the evening of February 17, 1961, he related that his wife threatened him with a pistol which he took from her and went down town and looked up the deputy sheriffs pleading with them to do something for her as she was out of her mind. They decided they didn't want anything to do with her and referred him to the justice of the peace. Being late and the petitioner having been drinking, the justice became aggravated and ended up according to petitioner, in the justice of the peace telling him to shoot his wife. He related that he returned home and found his wife with a 30/30 rifle loaded with three shells. In the conflict of taking the gun from her one shell was fired in the house. He then decided to take the gun to the sheriff's office, but apparently just prior to arriving, the deputy sheriff and justice of the peace saw

him coming and fired at him hitting him in the arm. He fired two shots back at them and fled deciding to turn himself in to the officers in Florence. He was apprehended, charged with assault with intent to commit murder, plead guilty and was given probation. He had no previous criminal record. His war record showed he served a little over two years in World War II with overseas duty. He was wounded by shrapnel and taken prisoner and kept in a Prisoner of War Camp in Germany 106 days and draws a small pension for service-connected disability. He was given neuropsychiatric examinations in 1946, 1948 and 1952 in Veteran's Hospitals receiving a diagnosis of psychoneurosis, anxiety reaction. Dr. Frazin's testimony indicates petitioner's condition affected his ability to tolerate stress and that the incidents of the evening created a stressful situation. Since the crime of assault committed by petitioner involved the trait of violence rather than truth and veracity we believe that it should not be given undue consideration in determining his credibility.

Respondent employer contends that the findings of the Industrial Commission are supported by reasonable and substantial evidence and that petitioner has failed to meet his burden of proving the material allegations of his petition.

In determining the issues we bear in mind certain rules announced by our Courts that (1) on a petition and application for readjustment or reopening of claim the claimant has the burden of proof, (2) the Commission has no right to disregard the testimony of an interested witness unless it be that the testimony has been impeached or contradicted or unless it be that the circumstances are such as to cast doubt upon the credibility of that testimony, (3) reasonable, uncontradicted statements of unimpeached witnesses are presumed true, and (4) the Commission may not substitute its judgment on matters lying exclusively within the field of medical science.

An analysis of petitioner's evidence shows it is uncontradicted in the following, among other, respects: That he was dragged and banged up in the accident, that the skull guard he was wearing was broken at the time, that from the very evening of the accident he has suffered severe headaches, and that he has been prescribed and has constantly taken medicines and pills for these headaches.

This evidence is corroborated by Dr. Finke's report filed with the Commission which stated petitioner:

"* * * was hospitalized here (company hospital) on 10/24/60 for multiple contusions and strains of neck, *head,* back and left buttocks."

(Italics ours)

Mrs. Dabbs' testimony together with the other evidence and the various doctors' reports and hospital records corroborate the prescribing and taking of headache pills. As an outpatient he was prescribed headache medicines. Dr. Stovall's report November 28, 1960 indicates occipital headaches, as does his testimony.

The first time petitioner was ever examined and tests made specifically for his headaches was when Dr. Frazin examined him March 13, 1961. Dr. Frazin was the only neurological specialist who examined petitioner for diagnostic purposes. His evidence was supported by petitioner's medical reports and treatment for headaches and petitioner's consistent complaints to every doctor regarding his headaches. Dr. Frazin's diagnosis was further supported by the objective physical findings which we need not repeat.

Respondent presented no contradictory neurological evidence. It introduced petitioner's past V. A. hospital records dated April 5, 1946, September 23, 1948 and January 14, 1952, none of which referred to any head injury and only once referred to headache symptoms. Respondent seeks to rely on the absence of treatment for head injury at the time of the accident as a basis for determining that no injury occurred and also on what Dr. Finke indicated were inconsistencies in findings. In this connection Dr. Frazin testified it was not unusual

**602**

and was probable that the disabilities of the brain would not show up immediately after the accident in tests for cranial nerve reactions. The evidence shows Dr. Frazin has specialized training in neurology and psychiatry whereas Dr. Finke treated petitioner as a general practitioner. Even assuming that petitioner suffered the chronic brain syndrome prior to the accident and that it was unbeknown, the evidence is overwhelming that the severe headaches and change in personality began after the accident. It is reasonable to assume that the injury aggravated this pre-existing condition which also could well affect his earning capacity.

Evidence that a new disability exists as a result of the injury by industrial accident is sufficient grounds to reopen a claim, Adkins v. Industrial Commission, 95 Ariz. 239, 389 P.2d 118 (1964).

In addition to the felony conviction we have discussed, respondent urges that petitioner's testimony stands impeached in other respects. It appears that when petitioner applied for employment with the company he filled out an application wherein he answered in the negative questions as to whether he had in any previous employment been disabled from work because of any physical disability, when in fact records in evidence refer to an injury he received while working for the Hercules Powder Plant years before.

In this regard it is our opinion that the headaches and other circumstances surrounding the accident independently corroborate the case history which petitioner gave to Dr. Frazin, and that the doctor's finding of disabilities of recent origin are also corroborated by evidence other than petitioner's testimony. Therefore, Dr. Frazin's testimony cannot be disregarded.

The findings and award of the Commission cannot be sustained upon the record.

Award set aside.

STEVENS, C. J., and CAMERON, J., concur.