412 P.2d 71

Vernice WOMACK, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, and James W. Brown Contracting Co., Inc., Respondents.

No. 1 CA-IC 16.

Court of Appeals of Arizona.
March 14, 1966.

Charles M. Brewer and James D. Lester, Phoenix, for petitioner.

Robert K. Park, Chief Counsel, by Dee-Dee Samet, Phoenix, for respondent Industrial Commission.

DONOFRIO, Judge.

This is a review by writ of certiorari to determine the lawfulness of an Award and Findings of the Industrial Commission issued on February 24, 1965. This Award affirmed the Award issued June 24, 1964, which in essence found that as the result of a compensable injury by accident claimant sustained a 10% general function disability. In addition, however, the February Award found:

"2. The Commission finds that the applicant has wholly failed to sustain the burden of proving that he has sustained a loss of earning capacity and is not entitled to an award therefor under the provisions of A.R.S. Section 23–1044, C & B 1956.

3. That in determining that applicant has no reduced monthly earning capacity as a result of his injury by accident, this Commission has given full consideration to each of the matters set forth in A.R.S., Section 23–1044 D, 1956, and full consideration to all other facts and circumstances pertaining to the case."

The question presented for review is whether the Findings and Award of the Commission are supported by the evidence.

The claimant suffered an injury to his back while carrying two 4′ x 8′ plywood cement forms from under a low bridge on a highway construction job. The accident occurred on August 4, 1961. Claimant saw a chiropractor for treatment that day, and returned to work until August 17, 1961, when he was laid off due to a material shortage. He was subsequently hospitalized and underwent surgery for the removal of a disc on November 8, 1961. His condition did not improve satisfactorily, and on the advice of a Medical Consultation Board's Report, claimant again underwent surgery for a spinal fusion on February 12, 1963. Claimant continued under medical care and continued to complain of head, neck and back pain. He was put on a light work order by the Commission December 19, 1963 on the recommendation of the Medical Consultation Board. He was not discharged by his attending physician at that time. Claimant was seen again by a Medical Consultation Board on June 4, 1964, and on the recommendation of the Board he was discharged by his attending physician on June 10, 1964. The Board determined claimant suffered a 10% general physical functional disability. Claimant's compensation was terminated on June 10, 1964 pending a determination of his loss of earning capacity, and has not been reinstated.

The hearing to determine claimant's loss of earning capacity was held in two parts, on October 29, 1964, and November 13, 1964.

The claimant presented the only evidence at the hearing. The Commission was represented by counsel and the employer was represented by counsel. In addition, the Referee actively participated in the cross examination of witnesses.

The claimant testified that he is a 47 year old male with a seventh grade education. He is married and has seven children, six of whom live at home and are totally dependent on him for support. Claimant became a member of the laborer's union in 1939, and was steadily employed at heavy construction jobs which he secured through his union and through personal contact with previous employers from that date until his accident in August 1961. He stated he never was out of work, he stayed busy all the time.

Claimant stated that he had seen his attending physician once a week or more often since his discharge June 10, 1964, and had been given prescriptions by that doctor. He testified at length as to the pain he experienced in his back and neck, "I hurts all the time. I am hurting right now."

Claimant testified that after he was put on a light work order by the Commission he tried to do some work around his home to see what type of work he could do, but that he experienced a great deal of pain and worked with a lot of difficulty. He stated that he had done some roofing work on his home, working for short periods of time and being physically careful, but it took him a long time to complete this. His neighbor testified that he worked on that roof for approximately two months. Claimant stated that he finished a bathroom he had been working on prior to his injury, that his work only involved laying and connecting two four foot lengths of pipe which weighed less than 15 pounds apiece. He also stated that he had made some concrete forms at the rate of one form a day. He said he found he could work for approximately one and a half hour periods only before having to stop and rest. The following exchange took place on October 29, 1964, on cross examination by the Commission attorney:

"Q. Mr. Womack, you have done these apparently very handy things around your house with the rooms and the bathrooms and so forth.

Have you made any inquiry if there are any other people in the Phoenix area who would use your services to maybe add a room to their house or help them with their plumbing?

A. No. I wasn't able to do my own, let alone try to do somebody else's. I did work an hour a day and go lay down and take pain pills until they stopped giving them to me. The Industrial said they wasn't going to pay for any more. I went and got some last week. My doctor gave me a prescription. That is the only thing that is keeping me up."

Again on November 13, 1964, in response to cross examination by the Commission attorney, claimant testified:

"Q. Haven't you given any thought to trying to find a job that would enable you to sit for a while, stand for a while?

A. I would if I could be able to give them service. You have to give them some kind of service, you know. They ain't going to give you no bed to lay down if you get to where you can't work or even sit.

Q. How do you know? Have you tried it?

A. I have been working all my life up until—

Q. Up until recently?

A. Up until I got hurt. That's the reason I know.

Q. Have you tried to find a job that would enable you to sit for a while, stand for a while, lie down for a while?

A. No."

A neighbor of the claimant testified that he had known the claimant since 1955, and had observed him frequently both before and after the accident. He corroborated the claimant's testimony that he had done heavy construction work around his home and on "side jobs" after his regular working hours before his injury; but that subsequent to the injury claimant could do very little work. He stated there could be no comparison between the work claimant did before his injury and what he could do after it. He testified, "There is very little work he can do now"; and that after his injury, "He never could straighten up and he never moved right. You know how a fellow, when he gets up, he can't straighten up complete; he goes kind of bent-like." He described the claimant as a sober, truthful man and an industrious and willing worker.

The Business Representative of the claimant's union testified that the claimant had approached him about the possibility of finding light work through the union. He testified that the work done by the union was heavy work, that there were few if any calls for light work, and that in his opinion claimant would not be able to retain employment in his (then) present condition. He testified that even in the light work jobs such as flagmen and watchmen, the workers must be on their feet and be alert, as often they control traffic at crossings where trucks are crossing on highway or street jobs. He stated that based on his experience of over seventeen years as business representative for the union, a man in claimant's physical condition would not meet the requirements of employers hiring through his union hall.

The claimant on direct examination was asked whether he could perform specific laborer's jobs which he had performed prior to his injury, and in each instance he replied that the pain in his back rendered him unable to perform that task. He stated that he had put his name on the union list, and had sought light work on several occasions, but other than that he had not made personal contacts with employers. The Commission brought out the fact that the claimant had completed and returned the Commission's standard forms required of claimants on light work order, listing employers contacted for suitable employment during a monthly period. The claimant, under oath for the first time in this matter, stated that he had not contacted all of the potential employers he had listed on the forms. The forms contain printed statements to the effect that claimant has made "an honest and active effort to seek and secure employment" and was "unable to obtain any employment which I was able to do with my disability." When asked why he had completed and signed the forms the claimant replied that it was because he had seven children who had to eat and go to school. When asked why he had listed the businesses if he hadn't contacted them for

employment, claimant testified that the Commission demanded it. The record shows that claimant submitted a form for the month beginning December 17, 1963, which contained a doctor's statement but no list of employers contacted for work. This is followed, in the Commission's file, by a mimeographed form with a notation typed on the upper margin, that, "you must list places you have applied for employment, if you are not employed * * *. Failure to comply with the Record of Commission's Action * * * will result in suspension of your benefits." The mimeographed portion is marked to indicate that the form was not complete and should be completed, dated and signed, then returned. This is followed by a second form which was completed.

The Commission file also reveals that the claimant hand-carried his form for the next period to the Commission's offices. A memorandum is filed with the form dated February 18, 1964, stating that claimant had asked, "if he could see someone in authority—Commissioners, to talk to them about his difficulty." The memorandum continues that claimant explained that he had been put on a light work order but just couldn't work for longer than one hour without pain, and had difficulty getting in and out of cars. He also was quoted as saying he could easily get work if he were able to do it.

The memorandum indicates claimant was told to "write us a letter."

A full recital of the circumstances surrounding the matter of these forms submitted by the claimant is necessary in view of the Commission's Finding #2 (supra), that claimant wholly failed to sustain the burden of proof that he has sustained a loss of earning capacity. As has been stated, the claimant alone produced evidence at the hearing. The evidence produced was that he has sustained a loss of earning capacity and that loss of earning capacity is 100%. The only way the Commission could have determined its Finding #2 is by totally disregarding all of the evidence the claim-

ant produced at the hearing. The Commission has made the identical statement in Finding #3 (supra) here that our Supreme Court disapproved with the following comment several years earlier:

" * * * the findings do not reflect what matters were given consideration in arriving at reduced earning capacity and we are of course wholly unable to determine how they influenced the ultimate award. The mere statement that these matters and others have been given consideration does not save this award from the appearance of being arbitrary." Wammack v. Industrial Commission, 83 Ariz. 321, 320 P.2d 950 (1958).

In the present case, a review of the entire file gives us insight into matters that may have influenced the Commission's Findings, and in the interest of eliminating unnecessary litigation, we feel constrained to comment upon these matters.

 The circumstance which seems to have been given most importance by the Commission is the matter of the forms of the Commission, on which claimant listed employers even though he had not actually contacted them for employment. We are not condoning this misrepresentation by the claimant, but we believe it has been emphasized out of all proportion to its seriousness when all the circumstances of claimant's position are correctly analyzed. The claimant was put on a light work order following examination by a medical consultation board in December 1963. He continued under medical care and continued to complain of pain and discomfort and was given medication for pain. The claimant was reexamined by a medical board of three doctors, one of whom was his attending physician, on June 4, 1964, when his condition was said to have become stationary. He was discharged by his physician on June 10, 1964, and all benefits both medical and compensatory were suspended as of that date even though the claimant continued to receive medication and treatment at his own expense. The forms in question were filed during the period from December 1963, to June 1964. The light work order served upon the claimant defined light work as "work which you can physically and mentally perform." The claimant's position throughout the lengthy course of the prosecution of his claim has been that he is physically unable to work due to pain. There was no misrepresentation on the first form claimant submitted. No employers were listed. This was returned by the Commission to the claimant, as we have stated, with a form directing him to complete it and return it. This he did. The next month, however, the claimant went personally to the Commission's office and attempted to see someone in authority and explain that he couldn't work because he "hurt too bad." He was dismissed summarily and told to "write us a letter." After this rebuff, the claimant began submitting completely filled out forms. He was still taking medication for pain and still being treated by his doctor. Claimant was trained as a heavy laborer. His steady employment was obtained through the laborer's union for over twenty years, and it is conceded even by the Commission that claimant can no longer do heavy laboring work. He had also attempted to tell "someone in authority" at the Commission that getting into and out of a car was painful to him. It is significant that while the claimant was still under medical treatment and was being medicated for pain, he was supposed to seek light work; that his attempts to explain that he was in pain while getting in and out of a car, and therefore that even the mode of transportation to seek work was painful, besides working being painful, were rebuffed. Claimant truthfully testified when under oath that he had not solicited employment from all of these businesses, and explained why he had not. We think these things mitigate claimant's misrepresentation even though we do not condone it. This matter came out on direct examination, when claimant testified he could not seek employment because he was physically unable to give service to an em-

ployer. It was not an inconsistent statement on the part of the claimant. It was most consistent with his position, that he is totally unable to earn a wage, and has lost 100% of his earning capacity. Claimant's testimony was corroborated by his neighbor, portions of whose testimony we have summarized herein, who had observed him before and after his injury, and testified he couldn't work after the injury, and was "kind of bent-like", and by the union business representative, who said that in his opinion based on years of experience, claimant was unemployable.

Outside of what has been stated there is no contradictory evidence presented. Since this was the only testimony presented the claimant sustained his burden of proof. Where evidence of an interested witness is corroborated by a disinterested witness in compensation proceedings a rejection of that evidence amounts to arbitrary action by the Industrial Commission. Stanley v. Moan, 71 Ariz. 359, 227 P.2d 389 (1951). It is established law in Arizona that testimony of an interested witness before the Industrial Commission may not be disregarded if corroborated by a disinterested witness. Williams v. Williams Insulation Materials, Inc., 91 Ariz. 89, 370 P.2d 59 (1962). Recently we held that the Commission could not elect to reject all the testimony given at a hearing on workmen's compensation claim merely because the only testimony received at the hearing was testimony of the claimant. Charles v. Industrial Commission, 2 Ariz.App. 202, 407 P.2d 391 (1965). The rejection of claimant's corroborated testimony was an arbitrary action on the part of the Commission. See also Dabbs v. Industrial Commission, 2 Ariz.App. 598, 411 P.2d 36 (1966).

This brings us to the second matter which apparently influenced the Commission's decision. We have carefully examined the claimant's testimony concerning the work he attempted around his home to see, as he put it, what work he could do. We find nothing in the record which supports the interpretation of this portion of claimant's testimony placed on it by the Commission's counsel in cross examination, by the referee in his editorialized case summary directed to the Commission, or by the Commission in their brief. The claimant actually testified that he worked for periods of not over 1½ hours and was then forced to take bed rest for periods of up to 2 hours. He testified that he was physically careful and did only the lightest of work and did it slowly, yet he was in constant pain. This testimony was summarized throughout the Commission's file as being "heavy work around his home", "hard labor at home from roofing to plumbing", and similar phrases. The cross examination by counsel for the Commission, the Referee, and counsel for the employer, take the same tack, that if claimant worked as he testified at home he could sell his services in a competitive labor market. Claimant was asked if he could perform any one of each of the types of work he had ever done, and also the usual jobs suggested to industrial claimants who have no training, of flagman, night watchman and school crossing guard. To each of these queries claimant replied that he was unable physically to perform them, and was corroborated in this by his neighbor and his union's business representative in their testimony. Claimant was then asked by the Referee if he had sought a job where he could "sit a while, stand a while, lie down a while", although the referee failed to mention what type of job meets this test, and claimant stated simply that he had not. In determining the future earning capacity of a disabled man the objective is to determine as nearly as possible whether in a competitive labor market the subject in his disabled condition can probably sell his services and if so, for how much. Sproul v. Industrial Commission, 91 Ariz. 128, 320 P.2d 279 (1962); Magma Copper Co. v. Industrial Commission, 96 Ariz. 341, 395 P.2d 616 (1964). The only evidence before the Commission here was that such services as this claimant had in his disabled condition were not marketable in a competitive labor market. There was no evidence at all to the contrary. Lead-

ing questions of the witness on cross examination, or the suggestion that a job might exist which might fit the claimant's disability, such as that made by the referee, without any evidence that there is such a job, what it is, and whether or not it is available to the claimant is not "evidence" which could conflict with the positive evidence submitted by the claimant.

■ The record of the hearing in this matter reflects that the referee actively participated in cross examination of the witnesses, even though both the Commission and the employer were represented by counsel. In addition, the referee's Case Summary to the Commission reads as an argument against the claimant's case on the merits rather than a summary prepared by a fair and unbiased hearing officer. We reiterate our holding in Lewis v. Industrial Commission, 2 Ariz.App. 522, 410 P.2d 144 (1966):

> * * * "We will further state that in reviewing the files of the Industrial Commission and the records of hearings conducted by the referees, that we do not look with favor upon hearings in which the referee, abandoning the cloak of impartiality, joins the attorney for the Commission as a second adversary against the petitioner and his counsel. Such action and conduct reflects upon the fair and impartial hearing which should be afforded to every petitioner for workmen's compensation, and could possibly be a ground for setting aside a finding and award of the Commission."

■ There is yet a third matter which may have influenced the Commission's decision. The Industrial Commission's Rehabilitation Department interviewed the claimant on April 28, 1964. The claimant stated that he had applied for Social Security benefits as a totally disabled worker and was drawing these benefits for himself, his wife and six dependent children. Great hue and cry was raised by each and every Commission employee concerning these Social Security benefits from the date of the Rehabilitation Officer's report forward.

The Officer's report, it is interesting to note, words it this way, " * * * claimant *admits* that he has been drawing Social Security benefits", (emphasis supplied) and concludes his report, "that further investigation regarding the Social Security benefits be confirmed, as these are real elements that prohibits (sic) claimant from finding employment or finding the need for employment." The Social Security Administration refused to reveal to the Commission's investigator the amount of disability benefits paid to the claimant and his family, so the Commission issued a subpoena duces tecum to the claimant ordering him to bring in his records. Over objection by claimant's counsel, the referee ordered the claimant to enter into the record of the hearing the amount of Social Security disability benefits he was drawing, and this amount was $254.20 for the entire family. Since the only issue in this hearing was what loss of earning capacity claimant suffered, we see little probative value in setting forth the amount of Social Security benefits paid to the family. The fact that the claimant, under a different law, is entitled to disability benefits from the Social Security, has no effect on the amount of industrial compensation claimant is entitled to draw. A.R.S. § 23–1044D sets forth what is to be considered to determine the reduced monthly earning capacity:

> "D. In determining the amount which represents the reduced monthly earning capacity for the purposes of subsection C of this section, consideration shall be given, among other things, to any previous disability, the occupational history of the injured employee, the nature and extent of the physical disability, the type of work the injured employee is able to perform subsequent to the injury, any wages received from work performed subsequent to the injury and the age of the employee at the time of injury."

The amount of Social Security benefits paid to claimant and his family is not in-

volved. The referee indicated that he wanted to know what income claimant had, because: "I am concerned, as will the Commission be, as to how you are supporting your family." Earlier, however, he overruled counsel's objection to the admission of this evidence on the grounds, suggested by himself rather than either of the two opposing counsel, that it was relevant to show motivation or lack of motivation for complying with the light work order. If this is the relevancy it has, then this is the light in which it should be considered; that is, whether the sum of $254.20 disability payment is motivation for a man with himself, his wife, and six dependent children to feed, clothe and support, a man who was steadily employed in an industry noted for a high rate of unemployment for over twenty years prior to his industrial injury, to willfully avoid working. It may be added that this $254.20 is the maximum Social Security benefit which can be drawn, and indicates that the Social Security Administration has determined claimant to be totally disabled and therefore entitled to his benefits.

 The Commission quotes from Schnatzmeyer v. Industrial Commission, 77 Ariz. 266, 270 P.2d 794 (1954) in support of its award, as follows:

> " * * * [t]he cause of unemployment is necessarily an inference to be drawn from all the facts and circumstances bearing on that issue * * *"

We are in complete agreement with this statement of the Supreme Court, but we do not believe it supports the award of the Commission. To the contrary, we believe the admission of the record of facts inferring that the Social Security Administration has determined that claimant is totally disabled, also corroborates claimant's testimony that he is in fact totally unable to work. Supporting this analysis of the import of the Social Security disability benefits is the report of the psychiatrist selected by the Commission to examine the claimant. The report states that the claimant (who at the time was also drawing tempo-rary compensation) had an income that would be difficult for him to match with earnings from light work. The psychiatrist commented: "This attitude does not, however, in this particular case, reflect a conscious parasitism." The psychiatrist concluded in his report that he doubted that psychotherapy could help the claimant, and that in his opinion claimant should be evaluated and awarded compensation when his condition became stationary.

The only evidence before the Commission in the instant case is such that the only reasonable conclusion that can be drawn from this evidence is that the claimant did suffer a loss of earning capacity, and that that loss is a total loss of earning capacity. The Commission's Finding that the applicant failed to sustain the burden of proving that he sustained a loss of earning capacity and was not entitled to an award therefor under the provisions of A.R.S. 23-1044C and B, was arbitrary and does not find support in the evidence.

The award is set aside.

STEVENS, C. J., and CAMERON, J., concurring.