441 P.2d 255

Thurston D. FOSTER, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona, Defendant Insurance Carrier, Southside Cabinet Company, Inc., Defendant Employer.

No. I CA–IC 167.

Court of Appeals of Arizona.

May 23, 1968.

Rehearing Denied June 20, 1968.

Review Denied July 9, 1968.

Charles M. Wilmer, Phoenix, for petitioner.

Robert K. Park, Chief Counsel, by Glen D. Webster, Jr., for respondent, Industrial Commission.

DONOFRIO, Judge.

The petitioner, Thurston D. Foster, was employed as a cabinetmaker by Southside Cabinet Company, Inc., defendant employer. He sustained a back injury arising out of and in the course of his employment on May 17, 1963. His claim was accepted and processed by the Commission. On April 29, 1964, the petitioner underwent surgery for removal of herniated discs in his lower spine. He was subsequently discharged with a 15% general physical functional disability as the result of the injury.

The petitioner made an attempt to return to work, but without success. His injury prevented him from returning to his regular employment as a cabinetmaker. The Commission sent him to a six-months' course in refrigeration maintenance. After completing the course petitioner attempted unsuccessfully to find employment in the refrigeration maintenance field. During this time he filed a petition to reopen his case for additional medical treatment. The petition was denied. One award was issued on November 3, 1965, finding that petitioner did not have a loss of earning capacity. This was protested, and another award was issued July 1, 1966, finding that petitioner could earn $200 a month, and was entitled to compensation based on a 61.93% reduction in earning capacity. October 21, 1966, petitioner filed a petition to reopen his case, alleging that he was unable to continue to achieve the $200 a month earning capacity. A formal hearing was set for January 23, 1967.

At that hearing the petitioner was present and testified with regard to his earning capacity. He testified that he had started to work for the Burns Detective Agency in January 1966. When he first started to work, he worked six hours a day on weekdays, and eight hours on Saturdays and Sundays, a seven-day work week. This lasted for approximately three months, then was cut to forty hours per week. He testified that he personally could not work a forty-hour week, and he cut his hours to three days a week and then to two, and then to "whenever I felt like working". He was asked:

"Would you explain to the Commission why you had to cut down in your hours, what the problem was?

"A Yes, I couldn't get up and down with my back. I could make a couple of trips up them stairs and back, and the third and fourth trip I couldn't get up, I would have to just drag myself up by the hand rail the last trip. Sometimes I'd make it, sometimes I didn't."

Petitioner was cross-examined extensively about work he could possibly do, and jobs available, and the tenor of his testimony remained the same. He maintained throughout the hearing that he was unable to perform any work which was available to him, even of the lightest nature, due to his physical incapacity.

At the end of the January 1967 hearing, a member of the staff of the Commission's rehabilitation department volunteered that he would work with petitioner in attempting to find some type of employment which he could perform. The hearing was then adjourned, to allow time for the rehabilitation department's consultation, and also for a further medical examination of the petitioner.

The continued hearing was held on May 1, 1967. Petitioner was asked to testify in order to bring the Commission up-to-date on his situation since the date of the January hearing. He was asked:

"Q The physical problems you had in January, 1967, the date of our last hearing; are those the same physical problems and complaints that you have today?

"A Yes, only I am in worse shape than I was then.

"Q You are in worse shape?

"A Yes, I can't do anything.

"Q Have you seen any doctor for purpose of treatment since the last hearing?

"A No, sir.

"Q In what way do you feel worse now than you did in January?

"A I can't hardly get up and down. I can't do anything."

The petitioner was also asked:

"Q Are you receiving any monies from any source?

"A Nothing, only from Industrial and Social Security.

"Q You are receiving money from Social Security?

"A Yes.

"Q Are you under 65?

"A Yes.

"Q You have disability benefits coming from Social Security?

"A That's right."

Further testimony indicated that petitioner had received his first Social Security benefits sometime in January 1967. His total Social Security benefits were $109 per month for total disability.

A doctor examined petitioner on behalf of the Commission and testified at this hearing. He was of the opinion that petitioner "can tolerate sitting, standing, bending, stooping to an 'average' degree compared to any other patient", but should avoid heavy lifting. Cross-examination of the doctor by petitioner's counsel indicated that it was his opinion that the petitioner's overweight condition caused his symptomatic complaints. He did testify that petitioner had an osteoarthritic condition in his lower spine. The doctor summed up his testimony in response to this question:

"Q How does the overweight situation cause discomfort in muscles you are referring to?

"A In this instance it causes him pain because he had an injury. He had an operation. He has some permanent partial disability as far as his back is concerned, and because of this the overweight, therefore, accentuates that defect that is there, not because he has the arthritis, but because he has the effects of the injury. That is why he has ap-

proximately 15% disability. That is why he doesn't have a normal back."

The record indicates that the petitioner weighed the same at the date of the hearing that he did when the accident occurred.

A fellow work employee of petitioner, Henry Wardein, testified that he had had an opportunity to observe petitioner, both on the job and around his home, and he had observed that he had apparent physical difficulties in moving, climbing stairs, and lifting.

The representatives of the Commission's rehabilitation department testified at the hearing, and on cross-examination it was brought out that he had actually had only one consultation with petitioner. He testified that he had talked with the manager of the Burns Detective Agency, and had learned that at the present time there were no jobs available that did not include walking up stairs. He testified that jobs without stair climbing were usually in private residences, and only occurred from time to time. They lasted from two to four days. The rehabilitation officer was asked:

"Q Have you called any other agencies, other than the Burns Agency through Lt. Hampton?

"A No, I don't think I did. I tried to get hold of this guard agency at one time, and never did reach the man, and I never got back to him again."

The petitioner was again called to testify, and reiterated the fact that he had stopped his work with the Burns Detective Agency because he was physically unable to perform the duties required of him.

Mr. Carl Hampton, Lieutenant of security with the Burns Detective Agency, also testified. He was asked:

"Q Mr. Hampton, are these residence assignments frequent or infrequent, as far as the Burns Agency is concerned.

"A I would say they are infrequent.

"Q Do you have any particular knowledge of why the Burns Agency was cooperative with Mr. Foster in allowing him

to work when he said he could, and let him not work when he said he couldn't?

"A Mr. Foster has always done his job, and while he was out at Luke, he always did his job there until such time when his back got so bad that he couldn't handle the full time assignment. We did keep him extra and he did work two days a week, and then it got so his back hurt him so bad he had to cut down to one day, and I took him off and put him out at McCune's.

"Q Do you want your employees to be reliable?

"A Yes, they have to be.

"Q Is it your opinion that Mr. Foster can be counted on now, in light of the fact that he has had to discontinue jobs on several occasions?

"A I believe Mr. Foster would try, but I don't know whether he would keep it up. I wouldn't say he would be unreliable, but say, if we had a two day job for him, he might work the first day and he couldn't work the second day. His back would hurt, and he couldn't.

"Q Has that happened before?

"A Yes."

He was also asked:

"Q If you had another man who was equally trained to be a security guard but who had no physical disability, would you hire him if he were available for the job, or would you ask Mr. Foster?

"A We would probably take the other man."

The Commission issued an award on July 6, 1967, reopening petitioner's claim, and entered its decision upon hearing and additional findings and award for unscheduled permanent partial disability. In this award the Commission made a finding that the applicant had sustained a 72.28% reduction in earning capacity, basing that finding on the following facts:

"(a) Applicant is now 57 years of age.

"(b) He has had nine years of formal education and on-the-job training as a real estate salesman and a six month course in refrigeration maintenance and repair at Phoenix Schools; Inc., in 1965.

"(c) During his adult life applicant worked as a carpenter and contractor for 30 years and worked as a cabinet assembler and sander for four years with the defendant employer.

"(d) While applicant had no apparent disability prior to the episode of May 17, 1963, on 3-4-60 he had sustained a compensable lumbosacral strain (Claim No. AU 8626) during treatment for which it was ascertained that he had Marie Strumpell disease and fusion of T-10-11. Also, while not in and of itself a disabling condition, medical testimony established that applicant's excessive obesity is the chief cause of his present complaints.

"(e) Due to a number of physical factors, of which residuals of his industrial episode is one, applicant is unable to perform work in a cabinet shop.

"(f) Applicant has the physical and mental ability to reasonably earn the sum of $145.60 per month as a security guard."

The Commission awarded petitioner benefits compatible with the determination of 72.28% reduction in earning capacity, or $208.82 per month.

The question before this Court is whether the evidence reasonably supports the findings and award of the Commission.

The petition and application for readjustment or reopening of claim filed by Mr. Foster alleges that shortly after the award of June 1, 1966, the claimant began to find it difficult to work as a security guard earning the sum of $200.00 per month. The claimant alleges that he made every attempt to work, but was not successful. He further sets forth that during the last several months (the petition was filed in October 1966) the claimant's earning capacity was well below $100 per month. The petition further states that no medical report was submitted with the petition because to his knowledge his physical condition had not changed.

It is the opinion of this court that claimant has sustained his burden of proving that he suffers a 100% loss of earning capacity as the result of his industrial injury and consequent disability. There is no evidence in the record to indicate that claimant has the physical and mental ability to earn the sum of $145.60 per month as a security guard. The testimony of the claimant, of his supervisor at the Burns Agency, of a co-worker in that employment, and a neighbor, corroborate the fact that claimant is totally disabled, and has no earning capacity. This evidence is uncontroverted in the record. The Commission submits the argument that because the claimant is drawing Social Security benefits for total disability, the Commission has the right to infer that claimant's complaints subsequent to his application for Social Security benefits were exaggerated for the purpose of obtaining them. This, they argue, creates a conflict in evidence. We cannot agree with this argument. Citing Arizona Supreme Court cases, we stated in Womack v. Industrial Commission, 3 Ariz.App. 74, 412 P.2d 71 (1966):

" * * * Where evidence of an interested witness is corroborated by a disinterested witness in compensation proceedings a rejection of that evidence amounts to arbitrary action by the Industrial Commission. Stanley v. Moan, 71 Ariz. 359, 227 P.2d 389 (1951). It is established law in Arizona that testimony of an interested witness before the Industrial Commission may not be disregarded if corroborated by a disinterested witness. Williams v. Williams Insulation Materials, Inc., 91 Ariz. 89, 370 P.2d 59 (1962). * * *"

In the *Womack* case, this Court also discussed the effect of Social Security disability benefits. We said:

" * * * The fact that the claimant, under a different law, is entitled to disability benefits from the Social Security, has no effect on the amount of industrial compensation claimant is entitled to draw. * * *"

We also pointed out that in the *Womack* case, the claimant was drawing the maximum Social Security benefit, just as the claimant in this case is drawing, and stated:

" * * * (which) indicates that the Social Security Administration has determined claimant to be totally disabled and therefore entitled to his benefits."

In addition, this record is replete with evidence that the claimant made a sincere, honest, and conscientious effort to secure and perform work of which he was physically and mentally capable, and that by his efforts he determined he was not able to work.

The award is set aside.

CAMERON, C. J., and STEVENS, J., concur.