460 P.2d 22

Barbara H. CLARK, a Widow, Petitioner,

v.

INDUSTRIAL COMMISSION of Arizona, Respondent,

Omer Casey, James Casey and Lee Casey, (Omer Casey and Sons), Respond-ent Employer,

State Compensation Fund, Respond-ent Carrier.

No. I CA–IC 246.

Court of Appeals of Arizona, Division 1.

Department A.

Oct. 20, 1969.

Rehearing Denied Dec. 30, 1969.

Review Denied Jan. 27, 1970.

Brandt & Baker, by Ralph F. Brandt, Yuma, for petitioner.

Donald L. Cross, Chief Counsel, Phoenix, for respondent Industrial Commission of Arizona.

Robert K. Park, Chief Counsel by Donald L. Cross, Phoenix, for respondent Car-rier State Compensation Fund.

STEVENS, Judge.

The persons material to this opinion are Merrill K. Clark, the deceased, herein refer-red to as the husband; Barbara H. Clark,

the widow who is the petitioner, herein referred to as the wife; and the minor child.

This matter came before us on a writ of certiorari to review the award of The Industrial Commission which found, among other findings,

"1. At the time of his death, and for approximately two months prior thereto, Barbara H. Clark had voluntarily abandoned the decedent, Merrill K. Clark.

"2. At the time of his death, and for approximately two months (prior) thereto, Barbara H. Clark was not dependent in any way upon the decedent, Merrill K. Clark."

There was an award in favor of the minor child and the child's status as a dependent is not in issue. We are called upon to determine whether the above findings are reasonably supported by the evidence.

As a young man and long before the marriage of the parties, the husband worked in the harvest of crops. He limited his work to the Yuma area. The family of the wife and the wife worked in and followed the harvest. This was a way of life for many persons and families. Among those who followed the harvest, there were those who engaged in the free exchange of intimate personal relationships. By those who so lived, this interchange was regarded as neither wrong nor immoral, but a part of their respective lives. To those who followed the harvest of crops there was a professional pride in their means of livelihood and often an impelling urge to follow the harvest.

The husband and wife were first married to each other, this being the first marriage for either one, in 1953. This was shortly after her 17th birthday and shortly before his 22nd birthday. The husband secured a divorce terminating this marriage approximately 18 months later. The wife then married another person in New Mexico, this marriage taking place shortly after the above-mentioned divorce. Less than a year later, the New Mexico marriage was dissolved by a Texas decree of divorce secured by the wife. A very short

time thereafter and in late 1955, the husband and wife were remarried to each other. The minor child was born in 1957. This marriage was terminated by an October 1960 divorce secured by the husband. He was awarded the custody of the child.

In October 1965, the husband and wife were again married to each other. This marriage was terminated by his death on 30 July 1967, a death arising out of the industrial accident in question. The injury and almost instantaneous death occurred at approximately 1:30 in the afternoon of that day.

The sequence of the melon harvest was generally first in the Yuma area, then in the Parker area, then in the Bakersfield area, and on to the Fresno area. The Garin Company was one of the companies which employed people in connection with the harvest in the Parker area and in California. Those who worked in successive areas and for successive seasons built up a seniority. The wife worked in the harvest in the Parker area and in the Bakersfield area in 1964, 1965, and 1966. Possibly she also worked in 1963.

The family life of the husband and wife was one of frequent tensions and disputes arising out of personal problems. They were both devoted to the child and he was devoted to both of them. Those who knew the couple believed that the husband was deeply in love with the wife. During the 1966 harvest season, the husband sued for divorce. The wife was served. After the completion of the harvest at Bakersfield, she returned to Yuma, they were again reconciled and the divorce action was dismissed. To those who knew the family this was expected.

The wife testified that for some time prior to June 1967, tensions within the family relationship again built up. She testified:

"A. We had been arguing, like I said, for weeks, and finally one night we argued until early hours of the morning and he demanded that I be gone the next day when he got home from work, he didn't want me there.

Q. As a result of his demand did you separate from him?

A. Yes, I left that day, the following day after the argument.

Q. When he came home that night, pursuant to his demand, were you gone?

A. Yes.

Q. Where did you go then?

A. Bakersfield, California.

Q. Do you have relatives in Bakersfield?

A. Yes, I have a brother and sister-in-law and their family.

Q. And you went to your brother's home in Bakersfield?

A. Yes.

\* \* \* \* \* \*

Q. At the time of your leaving, or at any time, did you have any intention of abandoning your husband?

A. No.

Q. Did you at all times intend to go back to him?

A. Yes, I always had.

Q. Could you give us an estimate of the number of previous times you had separated similarly from your husband?

A. The year before we separated.

Q. Under the same circumstances?

A. Yes.

Q. And you went back to him?

A. Yes, I can't remember the exact dates in the last few years, but even after we were divorced and it was final we would maybe go back together for two or three months or a period of time. But it's just—I don't know, we would still have the same problems."

Shortly after the wife arrived in Bakersfield, Garin's foreman, one Brown, contacted her to see whether she would work in the packing shed in the Parker area as a counter. She agreed. The wife and Brown went to Parker together and occupied a motel as Mr. and Mrs. Brown. She was known there as Mrs. Brown. "Industrial compensation is not based on the good moral character of the petitioner, but is founded upon whether the petitioner comes within the scope of the workmen's compensation statutes." Lewis v. Industrial Commission, 2 Ariz.App. 522, 526, 410 P.2d 144, 148 (1966). On or about 10 or 11 June the husband phoned the motel and asked for Mrs. Clark. On being informed that there was no one there by that name he asked for Mrs. Brown and was put in touch with his wife. As to the phone conversation, the wife testified:

"Q. Did he ever during the time you were in Parker or Bakersfield communicate with you?

A. Yes, he called me in Parker and he wanted me to come back to Yuma.

Q. What did you tell him?

A. I told him I didn't know, I was still angry and hurt, upset, I just couldn't make the decision right then."

This was confirmed in part by a motel employee who listened to the early portion of the conversation. The motel employee told The Industrial Commission investigator who in turn testified that the husband:

"\* \* \* asked her, 'What is the matter with you, why don't you quit this foolishness and come on back,' or something."

The wife and Brown worked in the Parker area until about 11 July when they moved to the Bakersfield area. It was not until after the wife had left Arizona for California that her husband again filed for divorce. The wife was never served. The husband did not urge service. The lawyer, a long-time friend of both parties, fully anticipated the return of the wife and a reconciliation.

On 4 July 1967, the husband wrote his life insurance carrier and changed the beneficiary of the policy to the child.

The harvest ended in Bakersfield on 30 July, the date of the husband's death. On that date she prepared to return to her husband fully expecting a reconciliation. In point of time on 30 July, it was after the hour of the husband's death and without the wife's knowledge of the husband's

death that the wife borrowed a suitcase from her sister in order to enable her to pack and return to Yuma. It was after she had borrowed the sister's suitcase that she first learned of the husband's death.

During her 1967 harvest employment, the wife earned approximately $1,000.00. As of 30 July she had her last paycheck, approximately $200, as her sole cash assets. The wife was not regularly employed, her major employment being the seasonal harvest time employment.

The wife returned to Yuma. The child immediately rejoined her, he having remained with the husband during the separation. The family unit consisting of the wife and child continues. The wife became the guardian of the child and the distributee of the husband's estate. The estate was distributed to her pursuant to A.R.S. § 14–517 which section provides for the assignment of the entire estate of the husband to the surviving wife where the estate is relatively small.

A.R.S. § 23–1041 provides in part:

"A. Every employee * * * or his dependents in event of his death, shall receive the compensation fixed in this chapter * * *."

A.R.S. § 23–1046 provides in part:

"A. In case of an injury causing death, the compensation therefor shall be known as a death benefit, and shall be payable in the amount, for the period, and to and for the benefit of the persons following:

\* \* \* \* \* \*

"2. To the widow, if there is no child, thirty-five per cent of the average wage of the deceased * * *.

\* \* \* \* \* \*

"4. To the widow * * *, if there is a child or children, the additional amount of fifteen per cent of such wage for each child until the age of eighteen years * * *.

"5. To a single surviving child * * * twenty-five per cent of such average wages * * *."

Subsection B of this section relates to persons who were only partially dependent upon the earnings of the deceased "at the time of the injury".

A.R.S. § 23–1064 provides in part:

"A. The following persons are conclusively presumed to be totally dependent for support upon a deceased employee:

"1. A wife upon a husband whom she has not voluntarily abandoned at the time of the injury.

\* \* \* \* \* \*

"3. A natural, posthumous or adopted child under the age of eighteen years, or over that age if physically or mentally incapacitated from wage earning, upon the injured parent.

\* \* \* \* \* \*

"B. Questions of dependency and the extent thereof shall be determined as of the date of the injury to the employee and the dependent's right to any death benefit shall become fixed as of such time irrespective of any subsequent change in conditions * * *."

It is noted that the phrase "at the time of the injury" appears in both A.R.S. § 23–1046, subsec. B and A.R.S. § 23–1064, subsec. A(1) whereas the phrase "as of the date of the injury" appears in A.R.S. § 23–1064, subsec. B. In relation to the case now before us, we find no significant difference in the meaning of these phrases. We hold, that under the facts we have under consideration, it is not significant that the wife started to pack to return to her husband approximately an hour or an hour and a half after his death, especially since she commenced her preparation to return prior to her knowledge of his death.

### ABANDONMENT

Had the wife "voluntarily abandoned" the husband "at the time of the injury"?

In our opinion the matter of abandonment or the absence thereof is a matter of the wife's state of mind. Her state of mind must be determined by her testimony coupled with the surrounding circumstances and past history of the parties.

"The Commission has no right to disregard the testimony of an interested witness unless it be that the testimony had been impeached or contradicted or unless it be that the circumstances are such as to cast doubt upon the credibility of that testimony." Quirk v. Industrial Commission, 3 Ariz.App. 84, 86, 412 P.2d 81, 83 (1966) (Review Denied). The foregoing quotation from Quirk was taken from Dabbs v. Industrial Commission, 2 Ariz.App. 598, 411 P.2d 36 (1966). See also Charles v. Industrial Commission, 2 Ariz.App. 202, 407 P.2d 391 (1965) and Womack v. Industrial Commission, 3 Ariz.App. 74, 412 P.2d 71 (1966).

█ It is not material that the husband changed the beneficiary on his policy or that he filed suit for divorce, a suit which was allowed to lie dormant. The fact that he may have had grounds for divorce by reason of her unorthodox conduct, unorthodox from the orthodox point of view, does not establish *her* intent to abandon. One witness close to the family saw the husband a day or two before his death and testified as follows:

"Q. But you do know that at least a day or two prior to his death that he loved his wife?

A. Yes, he always—

Q. He said he needed her and wanted her back?

A. Every time she left he always wanted her to come back.

Q. And to your own knowledge did this meet a particular pattern of conduct that had been going on between them for some time?

A. Yes.

Q. Is it your opinion they would have reconciled?

A. Yes, I still believe that. I don't know how long it would have taken, but I always believed that.

Q. You think possibly certain adjustments could have been made where they could have lived happily?

A. Yes."

and,

"But I'm sure that they both had quite a feeling for each other or they wouldn't have tried it so many times."

No Arizona case has been called to our attention which decides the issue of abandonment in the concept of the Workmen's Compensation law. One authority refers us to domestic relations cases for guidance.

"The analysis of almost all dependency questions is a weighing of two factors: Claimant's compliance with statutory requirements of relationship to the deceased, and dependency in fact. * * * Questions affecting relationship, such as validity of marriage or divorce, legitimacy, and obligation to support, are determined by the usual statutory and decisional domestic relations law of the jurisdiction * * *." 62.00 Larson Workmen's Comp. Vol. 2 (1968).

The matter of abandonment has been discussed by the Arizona Supreme Court in domestic relations cases. We cite Andrade v. Andrade, 14 Ariz. 379, 128 P. 813 (1912); Lundy v. Lundy, 23 Ariz. 213, 202 P. 809 (1922); Roden v. Roden, 29 Ariz. 549, 243 P. 413 (1926); and Ellis v. Ellis, 33 Ariz. 123, 262 P. 614 (1928).

In our opinion the evidence does not justify Finding No. 1 quoted earlier in this opinion. In our opinion the evidence supports only the conclusion that the wife had not "voluntarily abandoned" the husband.

## DEPENDENCY

██ The wife not having voluntarily abandoned the husband, she was "conclusively presumed to be totally dependent for support upon" her deceased husband. A.R.S. § 23–1064 subsec. A(1). We hold that Finding No. 1 was not supported by the evidence.

Notwithstanding our holding as to Finding No. 1, we deem it appropriate to briefly discuss Finding No. 2. The petitioner was the wife of the deceased at the time of his injury and death. Her seasonal employ-

ment did not establish an absence of dependency. Dependency "determined as of the date of the injury", A.R.S. § 23–1064, subsec. B, calls for a broader examination of the relationship between the deceased employee and the claimed dependent, an examination over an appreciable period of time. A dependent does not completely lose the dependency status under subsec. B merely because that person has a paying temporary job or seasonal employment at the time of the injury of the employee.

The award is set aside.

DONOFRIO, P. J., and CAMERON, J., concur.