434 P.2d 648

Seferino VALDON, Petitioner,

v.

The INDUSTRIAL COMMISSION of Arizona
and Maricopa County Highway
Department, Respondents.

No. I CA–IC 135.

Court of Appeals of Arizona.

Dec. 11, 1967.

Rehearing Denied Jan. 10, 1968.

Review Granted Feb. 20, 1968.

Donald J. Morgan, Phoenix, for petition-

Robert K. Park, Chief Counsel, by Dee-Dee Samet, Phoenix, for respondents.

STEVENS, Judge.

Seferino Valdon had passed his 65th birthday at the time of the industrial incident in question. The incident occurred in the course and scope of his employment. The doctors agreed that there are no objective residuals. Valdon urges that before the accident he could and did engage in heavy physical labor and that since the accident he can no longer do so. The question presented to us is whether the Award of The Industrial Commission, which determined that Valdon sustained no permanent disability bearing a causal relationship to the industrial incident, is reasonably supported by the evidence.

Valdon was born on 11 February 1898 and is a man of limited formal education. He has worked steadily since his youth. During most of his working life his employment has required physical strength. Valdon boxed professionally from 1914 to 1942. As a youth he learned the barber's trade and he followed this trade as a means of earning a livelihood for approximately 7 years before he became employed by Maricopa County. He testified that his customers were exacting and that some demanded to be closely shaven or as Valdon expressed it, his customers would say "Shave me close, give me a shave two days under the skin".

Valdon commenced his employment with the Highway Department of Maricopa County on 16 August 1956 a few days short

of seven years prior to the time of his injury on 29 July 1963. During the period of his employment by Maricopa County he did little or no barbering. During his employment by Maricopa County he was included within the State Retirement System, contributing a portion of his wages each payday as required by law.

At the time of his injury the Personnel Department of Maricopa County carried Valdon under an "Equipment Operator" classification. His duties were not limited to the operation of equipment. In his work he was assigned to a crew having the responsibility for painting traffic control stripes in the highway. Valdon's duties included unloading cans of paint weighing 80 to 90 pounds from carload shipments; mixing the paint for use on the highways, and dumping the paint into the striping machine; standing on the rear of a truck and stooping to pick up warning cones after the paint was dry; and other duties requiring strength as well as bodily movement. Only a portion of the time was devoted to the driving of equipment. In short, it was a job assignment calling for many types of physical activity. Some crew members were younger than Valdon and some were older.

Under the Retirement System, Valdon was eligible to retire at the age of 65 but was not required to do so. Under the employment policies in effect at the time of his injury, Maricopa County employees were permitted to continue to work until they reached the age of 70 if they were fully capable of properly performing their daily responsibilities. At a hearing held on 12 November 1964, Valdon's former supervisor, Mr. Caro, testified. In describing the work, he stated that,

"(T)here is no one man affiliated to one job in our department. We are sort of called a jack-of-all trades, because our department, we are limited to personnel."

He further testified that all members of the crew must be in good physical condition, that he could not use Valdon as a member of the crew in Valdon's physical condition as of the date of the hearing for the reason that,

"Well, like I just mentioned, some of our type work calls for moving fast on the roads, and you can't string along. You have to move behind your striping machines, and especially on the intersection machines. I mean, you have to move at a pace to where you have to block traffic ahead of that machine, sort of—well, marking pavement you have your left-turn slots, your right-turn arrows, your left-turn arrows, all this is marking and bending over and moving fast, so that the striping machines can move through and lay out the work and block the intersection. * * *

"In various types of work you have to handle sacks of reflective ground glass that reflects the paint at night. You have to move them out of the truck by hand and get them as fast as you can to the machine whenever it runs out. You have to mix paint, you have to lift up the buckets of paint after it is mixed with the thinner and put them in the machine. * * * It's a lot of physical work, yes, sir."

" * * * Mr. Valdon has worked with me in my crews up to the time of his injury. Mr. Valdon—I guess his physical background will almost say it—he was husky and he was fast, and he could move around and—well, let's say he held is (sic) age for doing the type of work we had in the department.

* * * * * *

"Well, he could—I would say that he could—he could do the work that normally I used to do when I was about, I guess, 29, 30 years old. I am 35 now.

"In other words, he could do whatever was expected out of him on these crews such as digging holes, standing on top of the truck, mounting the signs, mixing paint, picking up these sacks of reflective ground glass.

"Like I stated before, he filled the machines, mixed paint, set out cones, marked

the various intersections with the other crew members. Even as far as when we came to our loading on our paint and our own beads—they used to come in semi-trailers and tractors—and he used to pitch right along with the rest of us."

During the period of Valdon's employment with Maricopa County he sustained a number of injuries. In relation to some of the injuries there is an official record of a claim in the files of the Industrial Commission and these were referred to in connection with the claim in question. Valdon sustained a 1961 industrial incident resulting in an Award which determined that he had a residual 5% permanent disability to the left wrist. He also sustained an injury to his right wrist in about 1962 resulting in some limitation of motion. Notwithstanding these injuries, he continued his full-time employment and duties. In relation to at least one injury he testified that he made no claim merely taking a few days sick leave and returning to work. All agreed that Valdon was not a malingerer and that there was no reason to disbelieve his statements.

With this general background, a portion of which relates to post-injury matters, we turn to the injury in question. On 29 July 1963, Valdon was helping unload a carload of paint. The paint was in cans weighing between 80 and 90 pounds each. He was standing on one can, securing other cans and handing them to another member of the crew when he fell and injured his back and hip. He promptly reported the incident but declined to then file a claim with The Industrial Commission. He attempted to continue to work and was favored on the job as much as possible by his fellow crew members. The condition became more painful. Valdon sought medical aid at his own expense. Finally he stopped work on 23 September 1963. We do not have his work record between the time of the injury and 23 September. The Industrial Commission files disclose that the first reports in relation to the incident were the employer's report which was filed on 1 October and

Valdon's report which was filed on 3 October 1963.

The claim was not accepted by The Industrial Commission until 6 December 1963 after which Valdon was referred to an orthopedic surgeon by The Industrial Commission and we will refer to this doctor as the attending physician. Valdon received his first compensation payment from The Industrial Commission on 23 December 1963.

■ In the meantime he was eligible for Social Security payments and for State Retirement. The record before us does not disclose the date of his application for Social Security. The fact of the receipt of Social Security payments is not permitted to adversely reflect upon an injured workman's right to compensation. Womack v. Industrial Commission, 3 Ariz.App. 74, 412 P.2d 71 (1966). Valdon inquired as to retirement benefits and was informed that the payments would be between $8.00 and $12.00 a month. The exact sum was not established nor was this testimony rebutted. Under the law he was eligible to withdraw at least a portion of the contributions which had been deducted from his wages and paid into the Retirement Fund and he took this action on 20 October 1963, receiving $986.50.

■ The withdrawal of the money Valdon had paid into the Retirement Fund and the receipt of Social Security benefits appear to have persuaded some of the doctors that Valdon had retired voluntarily. The record does not reasonably support this conclusion. Valdon stated that he could always use money and that he had intended to continue working for Maricopa County as long as his employer would permit him to do so. Continued employment and continued contributions to the Retirement Fund would have increased his retirement benefits.

After a period of treatment, the attending physician found an absence of objective symptoms. At the same time Valdon continued to complain of pain and inability to move about as he had before the accident.

On 21 January 1964 a medical consultation was held, the attending physician being one of the four doctors. As a result of the consultation a complete clinical diagnosis was requested and furnished. This was essentially negative. Thereafter it was reported to The Industrial Commission that Valdon was in need of surgery for varicose veins. It is nowhere urged that this was industrially related. After the surgery and on 25 June 1964, there was a second medical consultation. Two of the doctors including the attending physician who participated in the first consultation, and two other doctors, constituted the board. The Board report contains the following:

"The patient continues to complain of pain in the low back and over the greater trochanter on the left, more so of the greater trochanter, stating this area bothers him so that he is unable to roll over on it at night. He still has not returned to work."

\*   \*   \*   \*   \*   \*

"This patient has recovered from the back strain which he sustained in the accident of July 29, 1963. He continues to have many other complaints which have been mentioned and abnormal physical conditions described in previous reports, not the result of the accident in question. The patient has had complaints referred to the left trochaneric region and some of these persist.

\*   \*   \*   \*   \*   \*

"In so far (sic) as the injuries sustained in that accident are concerned, the patient could physically resume the work to which he has been accustomed, although it is felt that the other nonindustrial conditions are advanced to the point where he would not be considered employable even although he had not already retired on October 20, 1963."

The board's report recommended that two or three injections in the trochaneric region be administered.

In the meantime, Valdon had been using a cane to aid him in walking. The attending physician recommended that he not use the cane as an aid to therapy and an aid to strengthening the area of the injury. On 17 August 1964, while attempting to step down a curb estimated to be 8 inches high, without the use of a cane, Valdon fell and injured a finger on his right hand. This injury was eventually held to be causally connected with the 29 July 1963 injury and was eventually held to have healed with no residuals.

At the hearing held on 12 November 1964, the only doctor who was called as a witness was the attending physician. He testified that at the time of the 25 June 1964 consultation:

"Well, his work was lifting heavy weights, 90 pounds, something like that, sacks weighing 90 pounds, and I personally didn't ever think he would ever get back to that kind of work again.

\*   \*   \*   \*   \*   \*

"At the time his main problem was pain in the left trochanter region, and we thought that he should have the benefit of some injections of cortisone into that area.

\*   \*   \*   \*   \*   \*

"He had pain in the back and the hip region.

\*   \*   \*   \*   \*   \*

"He continued to have complaints, yes, referable to \* \* \* the back and trochanter region. Now, the back was gone and the trochanter region remained.

\*   \*   \*   \*   \*   \*

"(I)nsofar as the injury sustained in the accident are concerned, the patient could physically resume the work to which he had been accustomed, although it is felt that the other non-industrial conditions are advanced to the point where he could not be considered employable even though he had not already retired.

\*   \*   \*   \*   \*   \*

"Well, as far as what we could find on him from physical examination, we didn't think that his hip itself would be—or the

back would be a disabling factor in that it would keep him from returning to work.

"Q. What was your concept of his regular work at that time, Doctor, if you recall?

"A. Well, if I recall, he had a job where he had to lift quite often, and he had to lift weights up as high as 90 pounds.

"Q. And you think he could still do that?

"A. No.

"Q. When you say he could physically resume work, it would be excepting lifting and something like that?

"A. No, as far as the injuries sustained in the accident were concerned. In other words, this individual is one who is getting to the point where he is not going to be able to work very long, or very much longer with that strenuous type of work, and we think he has reached that stage, you see. It wouldn't be fair to send him back to lifting 90-pound bags.

\*       \*       \*       \*       \*       \*

"Q. Okay, What was the reason for your mentioning in your consultation report that he was about to retire and had retired? Did this have any particular bearing on your opinion as to his general disability?

"A. No. We figured that just didn't change his condition, physical condition, any because when he retires he might have some other kind of job he wants to do; but as far as his status at the time of the examination, as far as his age and general physical condition are concerned, he was ready for retirement instead of being ready to go back to work.

\*       \*       \*       \*       \*       \*

"I think we have a man here of advancing age; he has reached the age he can't do the work he could do when he was young. That's the idea."

Throughout all of the many hearings, including the one in question, Valdon testified that there was some gradual improvement.

At the hearing in question he testified that he could not stand in excess of a half hour at a time; that he was limited in the number of blocks that he could walk; that he could walk slowly without a cane and that he fell when he tried to walk fast. Valdon testified that he went from place to place by driving an automobile. He stated that he could not mow the lawn. At a later hearing he testified that he could no longer hone or strop a razor; that he had tried unsuccessfully to secure barbershop employment. An additional hearing was held on 17 May 1965 at which the attending physician again testified. He verified that Valdon was still experiencing pains in the hip and continued to be unable to sleep at night on the hip. The Maricopa County personnel analyst testified that Valdon would not be hired as a new applicant even if there had been other work available which he was physically able to do. A third group consultation was held and the report of the group was dated 28 December 1965. The attending physician was a member of this four doctor group, the other three doctors seeing Valdon for the first time at the consultation. The following quotations set forth in the report are vital to this case:

"When the patient was seen today his individual complaints are those of a dull, aching pain in the low back area which is aggravated by heavy lifting and soreness in the region of the left hip which he states is aggravated by sleeping on that side.

\*       \*       \*       \*       \*       \*

"The right distal ulna is noted to be subluxed at the wrist but the patient has no complaints referable to the right wrist whatsoever. The patient states he is able to lift heavy paint drums weighing fifty to ninety pounds with no difficulty in his right hand whatsoever.

\*       \*       \*       \*       \*       \*

"The examiners are aware of the fact that this patient has now retired and is receiving Social Security compensation. However, they are of the opinion that he

could, if he so desired, return to his prior employment which included the duties of an equipment operator."

Thereafter the Referee's report expressed the opinion that Valdon was 100% disabled. The Industrial Commission disagreed with the referee and again declined to grant an Award for disability arising out of the 29 July 1963 and 17 August 1964 injuries. A further formal hearing was held on 31 October 1966. At this last hearing two of the doctors who first examined Valdon at the 28 December consultation testified. The first doctor could not recall the statements which Valdon made which lead to that portion of the report which recites that Valdon stated that at that time he could lift 50 to 90 pounds without difficulty. The doctor attributed Valdon's problems to normal wear and tear. He further testified:

"Q. Even though he is unable to lift and do the kind of work he was doing before the injury?

"A. Yes. Years have passed since the injury and I can't attribute everything that a patient demonstrates as due to his injury merely because it occurred after the injury.

\*　　\*　　\*　　\*　　\*　　\*

"I think this is what we were trying to point out in No. 3 of our conclusions: that we recognize that this man is old enough, he should be retired, he should not be made to go back to heavy work."

The doctor was asked:

"Q. Why was it necessary to mention the Social Security, for example, if the Social Security Board determined that he was totally disabled and gave him Social Security? Would this have any effect on your opinion at all?"

To which he replied:

"THE WITNESS: I am sorry that we mentioned it; but in examining these patients and we must remember that we were aware of why we were examining this patient, we try to think of the whole man, this is his past life, what we think he can do now and the fact that he is on Social Security was important to us. It meant that this man was past the wage-earning years and we agreed he was past the wage-earning years and I think this is part of our medical opinion. We don't completely divorce the individual from his physical incapacities in trying to evaluate him."

Further testimony of the doctor contains the following:

"(I)f I understand the legal complications here, just because he has functional loss at age 65 doesn't mean that he has disability at the age of 65."

\*　　\*　　\*　　\*　　\*　　\*

"I think we imply, but don't actually say, that this man has functional loss in areas when we state that (sic) recognize that he is now retired and on Social Security.

"Now I can't go any further than that. We didn't actually specify anything."

When asked about the statement attributed to Valdon to the effect that Valdon could lift 50 to 90 pounds, the doctor testified that:

"\* \* \* but in that particular sentence we are referring specifically to his right wrist."

And he concluded that the statment would bear on Valdon's general physical condition as well. The examination of this doctor concluded with the following question and answer:

"Q. I note you mention the fact that Mr. Valdon was on Social Security. Is it possible this was only to show even though he may not go back to work due to Social Security, as far as you consultants were concerned, he could go back to work as far as the injuries were concerned?

"A. Yes, we concluded he could return to his prior employment as an equipment operator.

"Q. I am trying to get in the clue for mentioning the Social Security.

"A. I think our only motive in that was to point out that this man is old, as I said before. I am sorry we said it."

The other doctor who testified admitted that there may have been a misinterpretation of Valdon's statement as to his capacity to lift as of the date of the consultation. The examination of this doctor discloses the following:

"MR. MORGAN: Q. What about his residual hip complaint?

"A. We thought these were subjective in nature and not objective.

"Q. What difference does it make?

"A. I think a great deal.

"Q. You don't believe him when he says this?

"A. Not at all; but I don't think these constitute disability. I get up in the morning with aches and pains, yet I go about my work and perform my chores.

"Q. If his hip hurt and his back hurts and he can only stand for a certain length of time without extreme discomfort, would this be a disability?

"A. If his hip hurts that would not constitute disability; if he is unable to stand for a long period of time and has loss of function, this would constitute disability."

At this hearing Valdon testified that while there was slight improvement in his condition, he was still unable to work and that he could not lift 50 to 90 pounds with his right hand, that he might be able to lift 25 to 50 pounds with both hands.

■■ We are unable to subscribe to the thought that a man who is 65 years of age and fully capable of working, does not receive a compensable injury merely because he is old enough to draw Social Security. In our opinion, the quoted portions of the 28 December consultation report are clearly erroneous in view of the long history, the consistent testimony of Valdon and the corroborating evidence of lay witnesses. These erroneous statements apparently weighed heavily in connection with the opinions of the doctors. It is the established law of this State that doctors may not express their opinion as to the capacity of a workman to perform specific industrial labor unless they are shown to have special knowledge with reference thereto. A recent statement of this principle is found in Powell v. Industrial Commission, 102 Ariz. 11, 423 P.2d 348 (1967). The "equipment operator" classification of Valdon and quantum physical activity in connection therewith was established by the testimony of Caro and Valdon. The record does not reasonably support the conclusion that he could perform these duties. We note an absence of testimony as to any testing by the Commission's rehabilitation department, or their evaluation as to his physical capacities.

■ The record reasonably sustains an Award of some percentage of physical disability having a causal relationship to the industrial accident. The record does not reasonably sustain an Award declaring a total absence of disability causally related to the injury in question when one considers the whole man. We recognize the difficulty facing the Industrial Commission in attributing the percentage of loss in this particular case.

The Award is set aside.

CAMERON, C. J., and RENZ L. JENNINGS, J., Retired, concur.

NOTE: Judge FRANCIS J. DONOFRIO having requested that he be relieved from the consideration of this matter, RENZ L. JENNINGS, J., Retired, was called to sit in his stead and participate in the determination of this cause.