Kay KENTON, Plaintiff-Respondent,

v.

HYATT HOTELS CORPORATION, et al., Defendants-Appellants.

No. 66839.

Supreme Court of Missouri,
En Banc.

June 25, 1985.

Rehearing Denied Aug. 7, 1985.

Michael E. Waldeck, Thomas B. Alleman, Robert L. Driscoll, John C. Aisenberry, Terence J. Thum, Kansas City, for defendants-appellants.

Max W. Foust, Steven D. Steinhilber, James P. Frickleton, Duke W. Ponick, Jr., Kansas City, for plaintiff-respondent.

ROBERT G. DOWD, Special Judge.

Plaintiff, Kay Kenton, who had completed two years of law school obtained a jury verdict of $4,000,000 as compensatory damages for injuries sustained by the collapse of the suspended skywalks in the Hyatt Regency Hotel lobby, in Kansas City, Missouri, on July 17, 1981. On after-trial motions, the trial court concluded that the verdict was excessive and entered an order sustaining a motion for a new trial unless the plaintiff filed a remittitur of $250,000. Plaintiff-respondent accepted the remittitur but an appeal was perfected by appellants

to the Court of Appeals, Western District. Appellants asserted trial errors and requested reversal and remand for a new trial or alternatively that the verdict be reduced by a remittitur of $2,000,000. Appellants contended that the trial court erred in refusing to grant a $2,000,000 remittitur. Countering that contention, respondent contended that the trial court erred in ordering a remittitur of $250,000 and requests that the verdict be reinstated in accordance with Rule 78.10.

The Court of Appeals, Western District, affirmed the judgment in all particulars but declined to restore the remittitur ordered by the trial court and transferred the case to this court. We now decide the case as an original appeal pursuant to the provisions of Mo. Const. Art V, § 10. We affirm in part and reverse in part. We affirm the judgment of the trial court, in all respects, except remittitur; we reverse that part of the trial court's order granting a remittitur, and, under the principles of the companion case decided this date, *Firestone v. Crown Center Redevelopment Corporation*, 693 S.W.2d 99, remand the cause with directions to set aside the order of remittitur, reinstate the verdict and enter judgment for plaintiff for the verdict sum of $4,000,000.

We adopt substantial portions of the opinion of the Court of Appeals written by the Honorable Jack P. Pritchard without quotation marks.

The facts and evidence are set forth as they relate to each of the points raised on appeal.

**I**

Appellants' first point is that the trial court erred in admitting evidence concerning events at the hotel on July 17, 1981. They contend: "Such evidence was not relevant to any issue relating to respondent's damages, because appellants admitted that respondent's injuries were caused by the accident. Because the evidence was inflammatory and prejudicial to appellants the jury's verdict was based upon improper passion and prejudice and was greatly enhanced." By subpoints to Point I, appellants expand: "A. The court erred in admitting testimony concerning events of the accident that did not relate to Ms. Kenton's injuries. B. The court erred in admitting into evidence videotape and still photographs of the accident scene. C. The court erred in admitting evidence of the design and weight of the skywalks."

Appellants first complain of the testimony of Ronald L. Olds, a fire captain of the Kansas City Fire Department. He arrived at the Hyatt Regency about seven minutes after the skywalks collapsed. He proceeded to direct his crew to insert a Herst hydraulic lift to raise the skywalks. He was able to crawl under the bottom section (in the area where the skywalks fell upon respondent), and he described what he saw and found: "A. There were people under it. They were alive. Some were pinned very strongly. Others were not so strongly pinned. I crawled back out. I had my crew start using the Herst tool and crib that section. I went back under and started pulling the ones out that I could, the ones that were most available. I worked— as I went in, I pulled them out. Most of the time this was effected by me grabbing a hold of them in whatever manner I could and my crew grabbing my feet and pulling me out." Olds described the sounds and noises he heard: "A. There was—there was sheer terror in voices. You had to block out everything so that you could do your job. There was blood and everything around. The smell was horrible." Olds also testified that in order to get live people out, he had to move debris, pieces of the bottom parts of the skywalks, bodies and other things.

Michael Mahoney was on assignment by KMBC TV—Channel 9, to do a story on the Hyatt Tea Dance which was in progress just before the skywalks fell. Prior to that time, he and his crew had made video shots of the dance floor area, and had moved to an area near the terrace restaurant, where there was an overhead panoramic view of the crowd and dancing people below. Ma-

honey was in the process of loading another video cassette tape in the machine when he heard two popping noises. He looked up and was able to witness the actual collapse and separation of the skywalks. There was a loud thud, and when the bridges hit the ground there was a large cloud of dust from the concrete. There was silence for a few seconds, and then there were people crying for help. Small portions of the videotape, thereafter taken (with gruesome parts eliminated, as conceded by appellants' counsel), were shown to the jury.

Respondent's sister, Ann Kenton, who was with her on the evening of the disaster, testified as to her observations of that occurrence. She and respondent arrived at the Hyatt about 6:15 p.m. on July 17, 1981. At the time of the collapse, Ann was not beneath the skywalks, but was in an area east of the dance floor. Respondent was beneath the area of the second and fourth floor skywalks which fell about her near the south end of the lobby. Ann, Captain Olds, and respondent all indicated the area (encircled) on Plaintiff's Exhibit 2, where respondent was situated, which was beneath the southern portions of the fallen second and fourth floor walkways. Ann described the sounds she heard coming from people in and around the skywalks after the collapse: "A. It was hysterical, hysteria. There were grown men crying for help and there was nothing I could do for them. There were people crushed everywhere, blood, and I looked in the area where she had been and there was rubble and bodies and I couldn't pick her out of the bodies. And the moans and screams." Ann later found respondent slumped in a chair to the west of the skywalks, and respondent was carried outside and placed on a gurney or a stretcher.

Still photographs of the scene were admitted into evidence, some in color and some in black and white. Ann Kenton identified Exhibit 4K as the area where respondent had been and described it thus: "A. There were people sticking halfway out from under the skywalk, from here up there were grown men screaming for help, moaning and I walked through the blood, or there was blood everywhere. And the rescue people were pulling out whoever was more alive than others, I suppose." None of the admitted photographs show any dead or injured persons.

The National Bureau of Standards report of the collapse was admitted into evidence, from which architect Berkebile testified, telling the jury that the fourth floor skywalk was located 45 feet above the lobby floor and was directly above the second floor skywalk which was 15 feet above the lobby floor. The skywalks were composed of concrete, steel, gypsum board, glass and wood and each of the four 30 foot sections weighed about 17,960 pounds. The trial court admitted this evidence to show the nature and composition of what struck respondent, but did observe, during colloquy, that it was obviously incredible and wrong to argue that 15 tons fell upon respondent. Her counsel conceded it to be obvious that all the weight did not fall upon her, and suggested that the matter be left to the jury for it to draw its own inference.

Appellants say that Mahoney's description of the scene in the moments following the collapse was without foundation because respondent, in testifying, had no recollection of those moments. A review of respondent's testimony shows she did remember that portion of the occurrence. She heard a loud cracking noise. She next remembered lying pinned under the skywalks with her head twisted around and her arm twisted behind her and hearing the screams and yelling of people, and a middle-aged man lying next to her screaming for help. She started seeing blood all around her. She remembered rescue workers above her discussing how they were going to remove her from the rubble, being careful how they moved her, and one of them placed a coat or something over her. She next remembered being sprawled in a chair and her sister coming up to her.

Appellants stipulated in the pre-trial class action Settlement Agreement that if a class member chose to litigate the amount

of compensatory damages, Settling Defendants would not contest liability for such damages. Appellants also, by counsel, admitted that respondent had suffered injuries from the collapse. There was, however, no admission of the nature and extent of her injuries (physical or mental). Appellants argue that the testimony concerning the events of July 17, 1981, was neither probative nor material to the issue of respondent's compensation; it was an attempt to incite the jury with evidence of how she was injured; and that the "slight probative value the testimony may have had concerning the nature of Ms. Kenton's injuries was outweighed completely by the gruesome and highly inflammatory nature of the evidence."

Appellants cite McCormick on Evidence, § 185 (2d ed. 1972), for the general rule that evidence must be both probative and material to the matter in issue to be admissible, to which general rule there can be no dispute. Appellants cite *State v. Floyd*, 360 S.W.2d 630, 633 (Mo.1962) wherein the court held that the admission of a photograph of a badly decomposed body in a homicide case was reversible error because the state of decomposition of the body was so advanced that the photograph served no legitimate evidentiary purpose, and thus, the judge exceeded his discretion in allowing such highly prejudicial evidence to go to the jury. The court stated, however, that where the tests of relevancy and probative force are satisfied it is not a valid objection to the introduction of evidence that it is gruesome, cumulative or corroborative of witness testimony. *State v. Floyd* at 633. Appellants also cite *Gatzke v. Terminal Railroad Ass'n of St. Louis*, 321 S.W.2d 462, 466 (Mo.1959), which merely held that it was error to exclude evidence that General Motors manufactured and put into service more than 3,000 locomotives without handrails where the locomotives were of the same design as the one locomotive which plaintiff claimed caused his injury, in refutation of his evidence. There is nothing in that case which would support appellants' contention that the above recounted testimony and evidence would not have relevancy and probative value. *Hawley v. Merritt*, 452 S.W.2d 604, 611–612 (Mo.App.1970), held merely that certain minutes entry excerpts were not relevant to prove a conspiracy, hence the trial court's order of new trial was proper. None of the authorities cited by appellants is dispositive.

There was a lengthy pre-trial conference as to the admissibility of the above-mentioned challenged evidence. Respondent says that proof was limited, and the evidence was not offered or received as bearing on appellants' conduct which was not an issue, but was offered instead for the purpose of showing how respondent was injured, both physically and mentally, as well as her location at the time her injuries were sustained. *Begley v. Adaber Realty & Investment Company*, 358 S.W.2d 785, 792 (Mo.1962), held that photographs of ductwork which fell upon plaintiff, taken after it had fallen and had been removed to a parking lot, was admissible to show the type of construction, the presence or absence of straps, and what type of object struck plaintiff. Respondent was similarly entitled to show the force, violence and traumatic circumstances of this tragic occurrence as bearing upon the nature, extent and duration of her injuries. Compare *Berry v. Harmon*, 329 S.W.2d 784, 794 (Mo.1959) [reversed and remanded on other grounds], where a photograph vividly showing the damaged interior of the automobile evidencing a terrific impact and showing blood stains on the car top was offered to show the force of the impact, a basis for plaintiff's injuries, and the place where the heads of the occupants were wedged after the accident, was held properly admitted as not being so inflammatory as to indicate any abuse of the court's discretion. *State v. Moore*, 303 S.W.2d 60, 66 (Mo. banc 1957), held that it is not sufficient cause to exclude demonstrative evidence otherwise admissible on the ground that the sight of it would tend to agitate the feeling of the jurors; see also *Stogsdill v. General American Life Insurance Company*, 541 S.W.2d 696, 701 (Mo.

App.1976). Even though photographs are gruesome and depict serious injuries they need not be excluded if they satisfy the rules as to the admission of demonstrative evidence. *Chism v. Cowam*, 425 S.W.2d 942, 947 (Mo.1967); and see also *Chandler v. Gorda*, 384 S.W.2d 523, 528 (Mo.1964).

The trial court, in ruling on the motion for new trial, expressed some concern about the testimony and photographic displays of the conditions immediately following the collapse of the skywalks, saying, "It was that part of the testimony presented by the plaintiff that *while relevant and appropriate* could not help but have evoked a great deal of sympathy for the plaintiff." The key words are here "relevant and appropriate," which under the above cited cases make the testimony and photographs admissible. The element of sympathy for this respondent and all the other injured and dead, and the relatives of everyone involved in the accident, is inherent in this case and could not be avoided by the triers of fact, or even this court, given the wide knowledge of this horrible tragedy.

The evidence of respondent's injuries is that she suffered a cervical fracture which produced an initial paralysis of her body. In addition, Dr. Walter Menninger stated that she was subjected to the most severe psychosocial stressor imaginable, Grade 7, and the traumatic event and the crippling effects it produced caused a dramatic and profound psychic trauma which is continuing in nature. Dr. Francisco Gomez, respondent's treating psychiatrist, and Dr. Menninger classified her psychiatric injury as post-traumatic stress disorder, chronic and severe. Dr. Menninger testified further that she exhibited symptoms characteristic of a post-traumatic stress disorder: re-experiencing the trauma by either recurrent recollections, recurrent dreams, or suddenly acting or feeling as if the event was happening; and a numbing of responsiveness or reduced involvement with the external world sometime afterward. Certainly, the jury was entitled to consider the evidence of the scene of the collapse, the utter chaos that prevailed, and the effect upon respondent of being pinned beneath the debris, amidst blood, dead and injured bodies, and the sheer terror of the voices around her, in evaluating her physical and mental injuries for the purpose of fixing her compensation. The evidence was relevant, material, and appropriate. Its probative value far outweighed any prejudicial effect it might have had on the jury. There was no error in admitting the evidence, and Point I is overruled.

II

In Point II appellants contend that the trial court erred in permitting respondent to introduce evidence of her poverty. They point to the opening statement of respondent's counsel: "The evidence will also be that [respondent] borrowed money to further her education;" and "[w]hen [respondent] got out of K.U., she worked for two years to save money to get into law school." No objection was lodged against those opening statement remarks. Then, during respondent's direct examination, she was asked how much she had borrowed up to the time of the Hyatt incident to supplement what she earned in the summertime and in part-time work. Appellants objected to the testimony on the ground of lack of relevance, which, after colloquy, was overruled. Respondent then testified that she had borrowed $16,000 in student loans which were to be paid back within 10 years after she got out of law school. Appellants do not specifically assign error in their motion for new trial that the testimony was inadmissible because it was irrelevant. They say in their briefs filed in the Court of Appeals, "The court erred when it denied defendants' motion for mistrial or an instruction concerning payment of plaintiff's medical bills after the plaintiff testified, over objection, that she had taken out loans to finance her law school education, said testimony being irrelevant to any issue in this action and prejudicially intended to elicit sympathy from the jury." No motion for mistrial directed to the admission of testimony about the student loan is found. It is impossible to see how that testimony

was related to or connected with the claims that appellants had paid the medical bills. Nevertheless, if the assignment be considered as an attack on the relevancy of the testimony, it would seem that it is certainly relevant to the status of respondent's independence prior to her injury, as was stated to the trial court, and there was no error in overruling the objection.

The next claim of improper evidence of poverty occurred in the cross-examination of Ann Kenton, respondent's sister. She was asked how often respondent drove her car now. She answered that respondent drove to therapy, physical and psychiatric treatments, but does so rarely. Then she was asked, "Q. Is the car equipped with any kind of special prosthesis or device? A. No. *We can't afford it.*" [Emphasis added.] Appellants seize upon the emphasized answer as being a deliberate appeal to the jury's sympathy by injecting the issue of poverty. Appellants' counsel did not object to the answer but instead followed the answer by this question: "Q. Well, now, just a minute, Miss Kenton. The fact of the matter is that my clients have paid all the medical bills in this case, haven't they?" During a following, lengthy colloquy with the court in chambers, § 490.710 RSMo 1978, was presented to the court as the basis of objection to counsel's question. That section first provides for advance payments or partial payments by a defendant or an insurer, without any admission of liability, and by subs. 2, any payments shall constitute a credit and be deductible from any final judgment for an injured person. But, "in the event of trial involving such a claim, the fact that such payments have been made shall not be brought to the attention of the jury." Appellants' motion for mistrial, based upon Ann Kenton's answer, made during colloquy, was denied, and their withdrawal instruction as to the evidence of respondent's hospital, medical and physical therapy bills, was refused (an issue not here presented). The trial court then instructed the jury: "The witness [Ann Kenton] made an answer to the last question. I am directing you not to consider that answer in your deliberations. Immediately following that, counsel for the defendants asked a question. A question is not evidence and may not be considered by you in your deliberations. You are instructed to disregard that question, that statement." There is no indication that Ann Kenton deliberately injected her voluntary remark in an effort to engender sympathy for respondent—her answer was spontaneous. In any event, the trial court's instruction to the jury to disregard her answer, and to disregard counsel's question (to remove any possible injection of an improper issue of advance payments under § 490.710(2), *supra*) was a sufficient corrective action as to this phase of the claimed improper answer and the question by counsel.

Appellants go on to the final argument of respondent's counsel in which he referred to her independent status, of getting student loans and jobs, above ruled to have been relevant to her situation before her injury. Even if the objection made during respondent's testimony is viewed as being continued down through final argument remarks, no error appears because the argument, like the evidence, was relevant to respondent's existent status. The same is true of her argument that she never had a car; she liked to walk, and "Of course, I doubt if she could have afforded it." It was further argued that "Kay Kenton and I are not Hallmark. We are not Crown Center. We are not Eldridge Construction Company." This latter argument was, of course, on a different subject than that of respondent's previous independent status. No objection was lodged to it, and no corrective action was requested. Therefore, the trial court cannot be convicted of error in not taking some sua sponte action.

Appellants complain also of a blow-up of a letter from Dr. Lana Minnigerode, one of respondent's physiotherapists, as injecting the matter of her poverty into the case. The letter, plaintiff's Exhibit 25U, was used briefly during the examination of urologist Dr. Ozar, and was displayed for a short period of time to the jury. The por-

tion of the letter which was called to the attention of Dr. Ozar related to respondent's fecal and bladder incontinence. The letter also contained this remark of Dr. Minnigerode: "I think that Kay is fairly accepting her disability, although her family still puts a lot of pressure on her to be normal, play tennis again, and so forth. Also, *I'm not really very pleased with the way the Hyatt lawsuits have gone, as none of these people have any money to live on whatsoever. Everything is still pending* because of a class action suit that was brought *so that Kay is still without money* and is having to live at home. I think this is bothering her a lot and she was previously very independent...." [Emphasis added.] Respondent's counsel said that he used the letter only as to its reference to incontinence, and he did not know that the emphasized portion was contained in it, and appellants' counsel conceded that there was nothing ulterior in its use. The matter was brought up after the jury retired from the courtroom. A lengthy conference on the subject was held in chambers, at which time the only relief requested was that the court instruct the jury that appellants had paid respondent's medical bills.

The trial court determined to voir dire the jurors to see if any of them had seen and read the offending sentences, and stated that during examination, the jury's attention was directed to the fifth paragraph, which was the reference to fecal and urinary incontinence. The jury indicated that all but one or two looked at the fifth paragraph. The court then asked, "Did any of you read any other portions of the letter when it was sitting here at any time?" Three jurors indicated they had, and they were interrogated by the court outside the hearing of the other jurors. Juror Sargent told the court that she read the bottom part about the condition she was in, but she did not read all of it—just a part—it was removed before she could read the whole thing. Juror Bahmani stated that she read a part of the letter following the part to which the jury's attention was directed, and recalled that Miss Kenton was facing her

disability very well but her family—"and that was all I got to." Juror Raffurty stated that she read from the second paragraph, but nothing else. [The above italicized words were contained in the last, or seventh, paragraph of the letter.]. Appellants then moved again that the court instruct the jury that they had paid the medical bills, which was overruled. Their motion for mistrial made shortly thereafter was denied. The court offered to instruct the jury that it was not to consider whatever parts of the letter it had read other than that to which it was directed, which offer was declined by appellants. The trial court, by its voir dire of the jury, clearly determined that there was no damage to appellants in exhibiting Exhibit 25U to the jury, since there was no evidence that any of the members read or remembered the offending sentences.

Because of the corrective action taken by the trial court to remove any prejudicial effect of the references to poverty, and to determine that no juror had read the letter statements of Dr. Minnigerode, none of appellants' cited cases are in point. In *Smith v. St. Louis Southwestern Railway Company,* 31 S.W.2d 105, 107 (Mo.App. 1930), the court overruled the objection to the argument that plaintiff was a poor orphan boy, without undertaking the duty to rebuke counsel in such a way as to dislodge the ill effects of the unwarranted remarks, but rather gave approval to the course pursued by plaintiff's counsel. See also *Green v. Ralston Purina Company,* 376 S.W.2d 119, 126–127 (Mo.1964). In *Lewis v. Hubert,* 532 S.W.2d 860, 866 (Mo. App.1975), plaintiffs did not take advantage of an offer to strike offensive evidence of their affluence, but insisted on the drastic remedy of mistrial. In *Monpleasure v. American Car & Foundry Company,* 293 S.W. 84, 86[4] (Mo.App.1927), the court sustained an objection to improper argument that plaintiff had no money for high-priced doctors. Appellants' Point II has been examined in the light of their contentions and the corrective actions taken by the court, and it is denied.

## III

In Point III, appellants contend both in the Court of Appeals and in this court that the trial court erred in refusing to exclude the testimony of two law school professors that respondent was unable to return to law school or to practice law. Two basic arguments are presented to support the point: (1) the two witnesses lacked the medical qualifications necessary to interpret medical records to form a proper opinion; (2) respondent's counsel did not propound proper hypothetical questions to obtain their opinions. Appellants conclude that because of these (claimed) errors the jury considered evidence incompetent in itself and as foundation for economic projections of respondent's future wage loss, and the award was greatly and improperly enhanced by the use of this evidence.

Professor James W. Jeans, of the University of Missouri at Kansas City, Missouri, was called as a witness for respondent. He has been licensed as an attorney since 1951, having prior to that time attended Washington University Law School at St. Louis for three years. He practiced civil trial and appellate work for about 14 years, and had been a law school professor for 18 years, during which time he continued to represent clients. He was familiar with the work habits and hours required of law students in and out of the classroom—on an average 16 hours a week is spent in class, and about 48 hours a week is spent outside of class in preparation. Extra-curricular activities such as moot court require extra time. Professor Jeans was provided respondent's hospital and medical reports, which had been admitted into evidence without objection, and which he reviewed. He was asked, "Q. Taking into account your 18 years as a professor at the local law school, taking into account your own experiences as a student at Washington University and taking into account the medical records that I have made available to you and which have been identified, do you have an opinion from the standpoint of a professor as to whether or not this young lady is able to resume law school at this time?" The objections made were that the witness was not competent to render an opinion that transcends the medical field, there was an insufficient foundation, and he was being asked to consider hearsay evidence and rely on the accuracy of that evidence in order to form a conclusion. The objection was overruled and Professor Jeans gave his opinion that respondent could not succeed as a law student. He also opined that the psychological and the emotional injuries that she suffered would keep her from being effective in other types of law that would deal with counseling and advocacy.

Elinor P. Schroeder, a law professor at the University of Kansas, similarly to Professor Jeans, gave testimony as to the rigors of attending law school. She had also examined the medical records of respondent which were in evidence. Assuming all of the facts of the medical records and medical evidence, she gave her opinion that respondent would not be able to become a full-time law student again, but she did say that she could resume the role of a part-time student. Professor Schroeder also gave the opinion that respondent could not practice law on a full-time basis, but she would be looking for some sort of part-time job, which would be difficult because there is no such thing as the part-time practice of law—when the demands are there they have to be met.

Appellants argue that the use of these two law professors to testify as to respondent's ability to continue law school and to practice law violated the rule that they must be physicians to render medical opinions. Appellants argue the law professors gave medical opinions. Strangely, appellants objected to the testimony of Dr. Andrew Kaufman, M.D., in response to a hypothetical question as to respondent's ability to return to law school. He was her treating physician, who performed surgery to stabilize her cervical fracture and disc protusion shortly after her injuries. That objection, which was in part that it was inappropriate for a medical doctor to talk about the challenges of law school, "which is probably a mixed question of law and

medicine.," was overruled, and Dr. Kaufman was permitted to give his opinion that respondent was not capable at the present time of returning to the full-time pursuit of law school. Dr. Kaufman, however, was not allowed to give his opinion as to her ability to practice law on a full-time and effective basis. This ruling was made upon the objection that the question assumed that respondent would go to law school, graduate therefrom, and at some point in the future would be called upon to enter law practice in a style characterized in the hypothetical question.

In their case, appellants produced a handicapped lawyer, David Gene Newburger, who practices in the St. Louis area in a firm. He also had been an Assistant Professor of Law at Washington University there. His disability, the result of polio, was to the muscles of his lower extremities, causing him to wear a brace on his left leg and use crutches when walking. He also had a loss of strength and function in his left arm, and his back muscles were weak with a spinal curvature. He described in detail the accommodations he has had to make in daily living, law school and in the practice of law. Using the hypothetical question put to him at the time his deposition was taken, which described respondent's condition in detail, Newburger described how respondent would go about finishing her law school education and accommodating her disability to the practice of law. He did concede on cross-examination that respondent's disabilities would affect her ability to attend law school, and thereafter would narrow her job opportunities.

The trial court properly determined that expert testimony was needed to inform the jury as to the physical and mental rigors of a person attending law school and practicing law. Members of the jury would not ordinarily have knowledge of that subject, and certainly the two professors, being actively engaged in that field would have superior knowledge and expertise thereof by reason of their education and experience. See *Kim Manufacturing, Inc. v. Superior Metal Treating, Inc.*, 537 S.W.2d 424, 428–29 [4, 5] (Mo.App.1976), where it is said that the admission of expert testimony should not be upset absent abuse, and *Butcher v. Main*, 426 S.W.2d 356, 359 (Mo. 1968). It seems clear that these professors' opinions would aid the trier of the fact in determining the effect of respondent's injuries and disabilities.

In addition to stating their knowledge and experience in the practice of law, and in teaching law school courses, both professors reviewed respondent's academic records, medical records, and reports which were in evidence without objection. Professor Schroeder had also personally met and interviewed respondent. There was thus a sufficient factual basis for them to give their opinions. They were not based upon hearsay evidence, nor were they giving medical opinions, as contended, involving evaluation of medical matters or conditions under cases such as *Cebula v. Benoit*, 652 S.W.2d 304, 308–309 (Mo.App. 1983) [a case involving a standard of medical care offered by the testimony of a non-doctor nurse] and *North Kansas City Memorial Hospital v. Wiley*, 385 S.W.2d 218, 221 (Mo.App.1964), holding that a hospital administrator was not qualified to allocate hospital records and billing expenses between a back injury and genito-urinary ills.

This case falls within the category of those allowing the opinion testimony of a non-medical expert witness on the employability of handicapped persons. Such a case is *Chrisler v. Holiday Valley, Inc.*, 580 S.W.2d 309 (Mo.App.1979), where a diving accident left plaintiff a quadriplegic, with bowel incontinence, sexual disfunction, and a reliance upon assistance to handle almost any activity or function except eating. Medical evidence established the conditions as permanent. The testimony of an employment counsellor, whose job it was to find employment for hard-to-place persons, including those with handicaps, to the effect that plaintiff was permanently unemployable, was held not to have been error. Defendant sought to strike her testimony on the basis that she was not an expert on

para- and quadriplegics. The court said, "This misconceives the nature of Mrs. Maly's expertise. She was an expert on employment opportunities, particularly those for hard-to-place people including those with handicaps. It was about those opportunities that she was testifying and she was aware of the requirements for a vast number of jobs. Her slight experience with para- and quadriplegics did not affect her expertise on employment opportunities...." *Chrisler, supra,* at 313.

Workers' compensation cases are analogous to personal injury cases regarding the issue of future employability. In *Spring v. Dept. of Labor & Industries of State,* 96 Wash.2d 914, 640 P.2d 1, 4 (1982), the court recognized the increasingly prevalent use of vocational expert testimony, in disability cases on the subject of future employability. The court said the vocation experts can offer a "more realistic appraisal of the overall ability and motivation of an injured worker, as their testimony is more likely to include an economic as well as medical analysis." 640 P.2d at 4. And note *Valdon v. Industrial Com. of Arizona,* 6 Ariz.App. 532, 434 P.2d 648, 654 (1967) [vacated on other grounds, 103 Ariz. 547, 447 P.2d 239 (1968)] stating, "[I]t is the established law of this state that doctors may not express their opinions as to the capacity of a workman to perform specific industrial labor unless they are shown to have special knowledge with reference thereto." See also *Davis v. Brezner,* 380 S.W.2d 523, 528 (Mo.App.1964); and *Vandaveer v. Reinhart & Donovan Construction Company,* 370 S.W.2d 156 (Mo.App. 1963), holding that lay witness testimony as to the nature, cause and effect of an employee's disability may be allowed where supported by *some* medical evidence.

The two experts Jeans and Schroeder are distinguished professors of law with extensive experience in the legal education field and in the practice of law. They have firsthand knowledge of the stresses and tensions of law school and what is required to successfully complete it. The two professors were not called upon to give any medical opinion, diagnosis, or prognosis of respondent's injuries and disabilities. Their opinions were within their expertise i.e., legal education and the practice of law and therefore were properly admitted.

Appellants also objected to the opinions on the ground that there was an insufficient foundation therefore, or that critical facts were omitted. Appellant never did call the court's attention to any specific deficiency, and did not undertake to supply critical facts claimed to be omitted. On the basis of the objections, the trial court properly overruled them. See *Brooks v. Travelers Insurance Company,* 515 S.W.2d 821, 824 (Mo.App.1974).

Appellants also objected to the testimony of Professor Jeans on the ground that it was based upon hearsay. As noted, he considered the medical evidence which had been admitted without objection. Appellants did not point out to the trial court any of the expert testimony which was based upon hearsay. Compare *Fowler v. Daniel,* 622 S.W.2d 232, 235[3–5] (Mo.App.1981).

Appellants also say that the testimony of the two professors permitted respondent's economist, Dr. Ward, to base his opinion as to her projection of economic losses on incompetent evidence. The answer is found in the *Chrisler* case, *supra,* page 313[4], where the court found no error in the economists' expert testimony as based upon the expert testimony of the employment counselor. The jury had the function of evaluating all the evidence of economic loss, both appellants' and respondent's, and the weight to be given thereto. See *Capra v. Phillips Investment Company,* 302 S.W.2d 924, 931 (Mo. banc 1957). Appellants' Point III is overruled.

## IV

In Point IV, appellants assign error by reason of the trial court's refusal to permit them to voir dire the jury panel as to whether anyone was familiar with the fund created as part of the settlement of the class action, and in the trial court's refusal to give their requested withdrawal Instruction F on punitive damages. They

say the information sought was necessary to select a fair and impartial jury and to insure that it did not base its award on speculation and improper factors.

Apparently, there was some pre-trial restriction on this type of voir dire interrogation, but appellants' counsel did ask the panel if there was "anybody that would have any problem accepting the idea that they could not assess even one penny of punitive damages in this particular action, so that your verdict would be whatever actual damages were incurred and not one bit because of fault or responsibility?" And, "Are all of you aware that a separate agreement has been made in the State court to resolve any questions of fault or claims for punitive damages? Is there anyone that doesn't know that? Are you all aware that a separate agreement has been reached with regard to the Federal class action litigation? You see all that stuff in the media. Are all of your aware of that?" No venire-person responded one way or the other to these questions.

Then during further voir dire proceedings, appellants requested the court to permit them to go back and ask the panel if they had understood that respondent had been a part of an arrangement and agreement and understanding that had been made with regard to settlement of a portion of the State court action. Appellants proposed to make these questions to the jury: "Are all of you aware that a separate agreement and settlement was reached in the State court, that this agreement and settlement in the State court does apply to Kay Kenton and that's within the system and applies to this action which is now pending before this honorable court?" The request for the further voir dire examination was denied.

As pertinent, the Class Action Settlement Agreement provides that a member, such as respondent, may elect to have the amount of compensatory damages determined by a jury trial, and the amount of punitive damages for any Class Member based on the conduct of any defendant participating in the settlement shall be limited to such class member's share of the Class Settlement Fund [fixed at $20 million]. Settling defendants were not to contest liability for compensatory damages, and a Class Member was not to present evidence of the conduct of any Settling Defendant. Clearly, respondent would be entitled to some proportionate share of the punitive damages fund in the proportion that her compensation damage award bears to the total compensatory damages awarded to class members, as computed by a mathematical formula when all damages were finally determined. That matter would be purely extraneous to the sole issue in the case—that of determining the amount of respondent's compensatory damages. The Settlement Agreement was obviously entered into for the purpose of providing punitive damage compensation to all class members and to separate that issue from any trial of compensatory damages. To permit the voir dire question proposed by appellants would violate the purpose and the spirit of the agreement.

Appellants seek to tie this issue to the admittedly wide publicity which was given to the skywalks' collapse and argue that they were improperly not permitted to inquire of the panel about any member having feelings about the settlement agreement, or the settlement funds, or concerning settlement, and to test the panel's indication (by its silence) that it was unaffected by the publicity. They say, "Had defendants been permitted to ask the jurors about their knowledge of settlements and the funds, the jurors could have searched their own minds about that specific subject to determine whether they had any such feelings [of anger, frustration, or question concerning the resolution of the two class actions]." Although *Littell v. Bi-State Transit Development Agency*, 423 S.W.2d 34, 37–38 (Mo.App.1967), holds that wide latitude is permitted on voir dire to inquire about any interest, direct or indirect, of a potential juror which might affect his or her final decision, as to matters at issue or to any collateral matter the voir dire here proposed would inject a matter wholly immaterial and irrelevant to the issue of com-

pensatory damages. Indeed, the attempt by appellants to inform the prospective jurors that there was some kind of a settlement in which she would be participating would serve no purpose other than to confuse the panel and implant some question as to whether she would be getting additional money from some other source, and thus prejudicially limit her recovery of her actual damages. Compare *Smith v. Nickels*, 390 S.W.2d 578, 581[3–5] (Mo.App. 1965).

The same reasoning applies to affirm the trial court's refusal to give Instruction F, which withdrew from the jury's consideration fault or responsibility for the skywalks collapse, since any punitive damages or aggravating circumstances are being handled outside of the trial from ·a fund which exists for that purpose. This issue was not for the jury's consideration. The jury was clearly informed that the sole issue was the amount of compensatory damages, and the instruction would have injected a false issue. No error appears in the refusal to permit further voir dire examination or to give Instruction F. Point IV is overruled.

### V

■ In Point V, appellants contend it was error for the trial court to refuse their requested Instruction E, "Your verdict will not be subject to any income taxes and you should not consider such taxes in fixing the amount of your verdict," and that the court erred in prohibiting them from arguing that the award for compensatory damages would not be subject to income tax, or to introduce evidence that it would not be taxable.

Appellants rely upon *Norfolk & Western Railway Co. v. Liepelt*, 444 U.S. 490, 498, 100 S.Ct. 755, 759, 62 L.Ed.2d 689 (1980), which held that in an F.E.L.A. case a defendant was entitled, as a matter of federal law, to an instruction similar to Instruction E, whether the case was tried in state or federal court. The Liepelt court relied in part upon *Dempsey v. Thompson*, 363 Mo. 339, 251 S.W.2d 42 (1952), which held that such an instruction should have been given

in that F.E.L.A. case. In *Bowyer v. Te-Co., Inc.*, 310 S.W.2d 892, 897[5] (Mo.1958), the court cited the Dempsey case for its rationale of instructing the jury that an award for damages for personal injuries is not subject to Federal or State income taxes, but held that the tendered (and refused) instruction went far beyond the Dempsey holding, hence there was not error in refusing to give it. Both the *Dempsey* and *Bowyer* cases were reviewed in *Senter v. Ferguson*, 486 S.W.2d 644, 646 (Mo.App. 1972), in which it was noted that both were decided prior to this court's adoption of MAI. *Senter* was a common law action for damages sustained in an automobile accident (not an F.E.L.A. case). The court held that the giving of an instruction that any award was not subject to federal or state income taxes was presumptive prejudicial error which may have tended to influence the amount of the verdict. 486 S.W.2d at 647. The instruction was held to be an impermissible improvement on MAI 4.01, contrary to Rule 70.01, and *Brown v. St. Louis Public Service Company*, 421 S.W.2d 255 (Mo. banc 1967). 486 S.W.2d at 647. The application to transfer to this court was denied in *Senter*. Following *Senter*, however, is *Tennis v. General Motors Corp.*, 625 S.W.2d 218, 227 (Mo.App. 1981), where the court stated that in order to conform with the *Liepelt* case, both MAI 8.01 and 8.02 applicable in F.E.L.A. cases were modified in the 3rd Edition of MAI to include a new sentence that "any award you may make is not subject to income tax." The court in *Tennis* noted that this court had not altered or amended MAI 4.01 in the 3rd Edition of MAI to include a direction that any awarded damages are "not subject to income tax." 625 S.W.2d at 227. The court in *Amos v. Altenthal*, 645 S.W.2d 220, 228 (Mo.App.1983) relying upon *Tennis* found no error in the trial court's refusal to instruct the jury that any award to plaintiff would be non-taxable in a non F.E.L.A. case. The trial court here cannot be convicted of error, requiring a new trial, in following the established law of this state with respect to denial of the giving of an additional instruction to MAI

4.01 on the subject of damages. We have not by decision or order modified MAI 4.01. Point V is overruled.

## VI

 Appellants' Point VI contends that the trial court erred in refusing to grant a remittitur of $2,000,000. They contend that as a matter of law the jury's verdict greatly exceeded the upper limits of "fair and reasonable compensation," the proper measure of damages, and that the verdict was, as the trial court itself recognized, the erroneous product of a mistaken evaluation of highly incendiary evidence and [was] improperly disproportionate to awards for comparable or more severe injuries.

Taking respondent's evidence in the light most favorable to her, as this court must do, her loss of income and the reasonably anticipated future loss of income because of the injuries sustained was testified to be $1,869,433 to $2,164,642; assuming she should complete law school and be employed as a lawyer on a part-time basis, her economic loss ranged from $1,605,846 to $2,018,316; [by comparison, appellants' expert placed her economic losses as high as $1,371,065]. Respondent's evidence shows her economic losses to have been between $1,605,846 as a low, to a high of $2,164,642.

The evidence shows that, to the time of trial, respondent's hospital, medical and therapy expenses incurred amounted to at least $80,000; her future physical therapy and cost of an electronic device (T.E.N.S.) was from $189,759 to $250,000; her homemaking assistance and care, $307,228 to $614,457; her future medical and supplemental insurance, $100,679. This evidence places the low of these items at $677,666, and the high at $1,045,136.

The economic loss, present and future medical, and therapy expenses thus shows a range of between $2,283,512 to $3,209,778.

Respondent's age was 28 years at the time of trial. She has a life expectancy of 51.8 years.

The nature and extent of respondent's injuries, is shown by the following evidence, all shown to have been permanent. She suffered a broken neck with permanent spinal cord damage [with miraculous surgical treatment, she avoided becoming a permanent quadriplegic]; she has spasticity and weakness in all four limbs, inability to walk without crutches, and must wear a knee cage to prevent buckling of the left knee; lack of endurance and easy fatigability; reduced vital capacity and impaired breathing muscles; sensory loss of much of her body below her neck, including female parts. She will not enjoy a normal sexual life or have children normally; she has impaired bladder and bowel function with periods of incontinence. Her bladder condition causes her to retain urine which will eventually produce renal or kidney damage; psychic and emotional trauma diagnosed as chronic and severe post-traumatic stress syndrome, which will require continued psychiatric care; destruction of her athletic lifestyle which will prevent her from ever again playing tennis, skiing, running, jogging, playing softball, raquetball, hiking, backpacking and riding horses; and a commitment to 2 to 4 hours a day to maintain her present limited muscle function.

There was some evidence that respondent's cost of therapy and the T.E.N.S. unit would increase over her lifetime, and her income would also increase should she be employed as a lawyer, these being the effects of inflation.

The jury was entitled to consider the intangibles of the evidence of respondent's past and future pain and suffering, the destruction of her previous lifestyle, along with the evidence of economic loss. All of the matters going to the nature and extent of respondent's injuries were primarily for the jury's consideration because it is in a far better position to appraise them for the assessment of damages which would fairly and reasonably compensate her. *Koehler v. Burlington Northern, Inc.*, 573 S.W.2d 938, 946[27] (Mo.App.1978); *Long v. Hooker*, 443 S.W.2d 178, 182[5, 6] (Mo.1969). In

*Fowler v. Park Corporation,* 673 S.W.2d 749, 758 (Mo. banc 1984), the plaintiff suffered the loss of both legs above the knees. He was 19 years old, with a life expectancy of 50 years. He had not successfully used prosthetic devices; he would need constant care and medical attention, and had doubtful employability. He did not introduce evidence of economic damage other than showing that he stood to lose one million dollars in earnings based upon present wage levels, and the court said that he would obviously be incapable of leading a normal social life. The jury awarded $6 million to Fowler for his damages, and this court declined to interfere with the amount of the verdict.

Appellants cite *Chrisler v. Holiday Valley, Inc.,* 580 S.W.2d 309, 312 (Mo.App. 1979), wherein the plaintiff, 17 years old, was rendered a quadriplegic by reason of a diving accident, and the jury returned a verdict of $2.3 million, which was affirmed. That case does not aid appellants. There was apparently no evidence of economic loss by the plaintiff, but importantly, the court said:

> In most litigation, and particularly in personal injury actions, there is a large range between the damage extremes of inadequacy and excessiveness. Within that range a jury has virtually unfettered discretion to determine the damages incurred and is under no obligation to, and is in fact prohibited from, specifying what amounts have been attributed to each of the various elements of damage. Past and future pain and suffering, embarrassment and humiliation, future care and medical treatment, loss of or reduction in employment opportunities and many other factors, do not lend themselves to precise calculation.

580 S.W.2d at 312

There is no exact formula to determine whether a verdict is excessive; each case is considered on its own facts. The ultimate test is what fairly and reasonably compensates plaintiff for the injuries sustained. In making this determination consideration is given to the nature and extent of the injuries, diminished earning capacity, economic conditions, plaintiff's age, and a comparison of the compensation awarded and permitted in cases of comparable injuries. *Graeff v. Baptist Temple of Springfield,* 576 S.W.2d 291, 309 (Mo.1978); *Ricketts v. Kansas City Stock Yard of Maine,* 537 S.W.2d 613, 619 (Mo.App.1976). This case is not out of line with others, including the Chrisler and Fowler cases, on the tangible damages shown to cause this court to take corrective action. Point VI is denied.

■■■ Turning to the merits of this case, we believe that the trial court abused its discretion in ordering a remittitur of $250,000 after a verdict of $4,000,000 under the circumstances of this case. This amount represents a miniscule percentage (6.25%) of the total verdict which demonstrates judicial hairsplitting and shows the extremes to which the remittitur practice has fallen. The order of remittitur here is set aside in accordance with the holding in *Firestone v. Crown Center Redevelopment Corporation,* 693 S.W.2d 99 (1985), which "concludes that remittitur shall no longer be employed in Missouri."

What we said in *Firestone, supra,* as to the power and discretion of trial courts to control jury verdicts is equally applicable here.

Accordingly, the verdict of the jury is affirmed and the cause is remanded with directions to set aside the order of remittitur and to reinstate the verdict and enter judgment for the plaintiff, Kay Kenton, in the sum of $4,000,000.00.

RENDLEN, C.J., HIGGINS, BILLINGS and DONNELLY, JJ., and MORGAN, Senior Judge, concur.

WELLIVER, J., dissents.

GUNN and BLACKMAR, JJ., not sitting.